*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2015 UT 60**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

GREGORY N. JONES,
*Appellant,*

*v.*

MACKEY PRICE THOMPSON & OSTLER,[1]
*Appellees.*

No. 20130135
Filed July 28, 2015

Third District, Salt Lake
The Honorable Anthony B. Quinn
No. 060911956

Attorneys:

James D. Gilson, J. Tayler Fox, Salt Lake City, for appellant

Thomas R. Karrenberg, Salt Lake City, for appellees Mackey Price
Thompson & Ostler, Randall A. Mackey, and Gifford W. Price

Blake T. Ostler, Salt Lake City, for appellees C. Jeffrey Thompson,
Russell C. Skousen, Thompson & Skousen, L.L.C.,
and Russell C. Skousen, L.L.C.

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM, JUSTICE PARRISH, and
JUDGE LAWRENCE joined.

Due to his retirement, JUSTICE NEHRING did not participate herein;
THIRD DISTRICT JUDGE BARRY G. LAWRENCE sat.

JUSTICE DENO G. HIMONAS became a member of the Court on
February 13, 2015, after oral argument in this matter, and
accordingly did not participate.

---

[1] Randall A. Mackey, Gifford W. Price, C. Jeffrey Thompson, Russell
C. Skousen, Thompson & Skousen, L.L.C., Jeffrey Thompson, L.L.C.,
and Russell C. Skousen, L.L.C.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1    This case arises out of a dispute over compensation paid to an attorney, Gregory Jones, by the law firm Mackey Price Thompson & Ostler (Mackey Price) for work Mr. Jones performed on several class-action contingency fee cases involving the weight-loss pill Fen-Phen. Mr. Jones worked on the Fen-Phen cases from 2002 to May 26, 2005, when he abruptly developed a mental disability called dissociative amnesia, which prevented him from remembering anything prior to that date. This disability also prevented him from continuing to work on the Fen-Phen litigation. The Fen-Phen cases eventually generated $1,060,869.20 in fees, and Mr. Jones was paid $165,000 (or around 15 percent) of these fees.

¶2    Mr. Jones claims that he and Mackey Price agreed that the general Compensation Agreement (which entitled Mr. Jones to 80 percent of the fees he generated from hourly work after payment of his overhead) would apply to the fees generated by the Fen-Phen litigation. In the alternative, he argues under quantum meruit that Mackey Price and additional Defendants were unjustly enriched by his work. Finally, Mr. Jones claims that a second law firm that worked on the Fen-Phen litigation and received a portion of the fees, Thompson & Skousen, is liable to him under Utah's Fraudulent Transfer Act as recipients of the disputed funds.

¶3    Mr. Jones appeals a series of decisions by the district court. First, he appeals the district court's dismissal of his contract claim on summary judgment. Second, he appeals the district court's decision to deny his jury demand on his quantum meruit claim. Third, he challenges the district court's measure of damages under his quantum meruit claim. Finally, he appeals the district court's decision to dismiss his quantum meruit and Fraudulent Transfer Act claims against the individual Defendants.

¶4    We uphold the district court's dismissal of Mr. Jones's contract claim. Mr. Jones claimed that he and Mackey Price had agreed that the Compensation Agreement would govern the Fen-Phen fees. Mackey Price moved for summary judgment on this claim, arguing that it was undisputed that no such agreement was reached. Mackey Price directed the court to evidence supporting this assertion and in response, Mr. Jones failed to present affirmative evidence demonstrating a genuine issue of fact for trial regarding this claim. Accordingly, we affirm the district court's dismissal of Mr. Jones's contract claim.

¶5    We reverse the denial of Mr. Jones's jury demand because at the time of the ratification of the Utah Constitution a claim for money damages under quantum meruit was a claim at law, not in equity. In sending the claim back to the jury, we clarify that the correct measure of damages for the contract-implied-in-law branch of a quantum meruit claim is the benefit conferred. Finally, we uphold the district court's dismissal of the individual Defendants from both the quantum meruit claim and the Fraudulent Transfer Act claim.

## Background

¶6    Mr. Jones began working for Mackey Price in 1991. Over the next ten years Mackey Price paid him a salary based on the number of hours he billed. The lone exception to this arrangement was a personal-injury contingency fee case that he originated. In January 2001, Mr. Jones and Mackey Price began experimenting with different compensation arrangements to accommodate his health problems. Finally, in 2002, they agreed to the following Compensation Agreement: the first $4,000 in legal fees generated by Mr. Jones would go to Mackey Price to cover a portion of Mr. Jones's overhead; the next roughly $2,000 would be split fifty-fifty to cover the remaining overhead; and once all the overhead was paid for the current month and all previous months, Mackey Price would retain 20 percent of all fees generated by Mr. Jones and he would receive the remaining 80 percent. Although the Compensation Agreement was never reduced to writing, it governed compensation for Mr. Jones's hourly work until he left the firm in May 2005.

¶7    The litigation that spawned the fee dispute between Mr. Jones and Mackey Price related to the diet drug fenfluramine and dexfenfluramine—known as Fen-Phen. In early 2002, C. Jeffery Thompson and Russell C. Skousen, partners at the law firm Thompson & Skousen, began supervising and managing the Fen-Phen case program.[2] As part of this program, Thompson & Skousen set up a client-referral program, located physicians and other Fen-Phen experts, arranged for financing of litigation costs, and arranged for clients to receive the medical testing necessary to demonstrate injury from the drug. They also established relationships with attorneys in other states to help facilitate the litigation.

---

[2] Mr. Thompson and Mr. Skousen were also associated with Mackey Price, but they operated Thompson & Skousen as a separate entity.

¶8 Mr. Thompson and Mr. Skousen presented Mackey Price's attorneys with the opportunity to work on the Fen-Phen cases. Later, Thompson & Skousen reached an agreement with Mackey Price regarding how the firms would split the fees. Under this agreement, Mackey Price attorneys were to be paid from Mackey Price's percentage of the fees.

¶9 In 2002, Mr. Jones decided to work on the Fen-Phen cases and began contacting medical practitioners to find clients. He enlisted Rebekah Brown, a Mackey Price employee, to help him locate potential clients. Ms. Brown cold-called Dr. Poulsen, who entered into a services agreement with the law firm Thompson & Skousen. This agreement provided that Dr. Poulsen's patients could receive an echocardiogram test and cardiologist evaluation paid for by the firm. While Mr. Thompson ultimately negotiated the service agreement with Dr. Poulsen, Mr. Jones did much of the other work, including meeting with clients from Dr. Poulsen's office, assisting with their medical testing, and helping them fill out the paperwork to submit their claims.

¶10 Mr. Jones also contacted various diet centers located in Georgia and paid for some of the expenses he incurred to travel there for meetings. He performed much of the work associated with entering into agreements with the diet centers and he arranged to have their patients receive medical testing.[3] Thompson & Skousen made arrangements with two law firms, Armstrong & Guy and Thach & Thach, to manage the cases for the Georgia patients. To assist those firms with the Georgia cases, Mr. Jones advanced $6,000 in personal funds and borrowed approximately $167,000 from his neighbor at an interest rate of 30 percent per annum to help cover litigation costs. He did not inform Mackey Price that he was funding the Georgia cases. Finally, Mr. Jones also performed a large amount

---

[3] The district court's finding of facts from the bench trial contradicted Mr. Jones's version of the facts on this point. The court found that, while Mr. Jones made the initial contact, Mr. Thompson and Nancy Armstrong, a partner at the law firm Armstrong & Guy, flew to New Orleans and Georgia to negotiate and consummate the service agreements. The court also found that Mr. Jones "had no contract with the clients in Georgia."

of work on eight cases that originated from the medical offices of Dr. Brown.[4]

¶11 The facts regarding Mr. Jones's compensation are central in this appeal. Initially, Thompson & Skousen proposed that Mackey Price pay him 40 percent of the fees generated from the cases he originated. Following these discussions, Mr. Thompson told Mr. Jones that Mackey Price would pay him 40 percent of fees on cases he originated. But approximately six weeks later, Mackey Price adjusted the fee percentages between it and Thompson & Skousen and requested that Mr. Thompson stop discussing Mr. Jones's compensation because he was an employee of Mackey Price, not Thompson & Skousen. Mr. Thompson later told Mr. Jones that Mackey Price did not agree to pay him 40 percent, and he urged Mr. Jones, on multiple occasions, to negotiate his compensation with Mackey Price.

¶12 During a discussion Mr. Jones had with Gifford Price, a shareholder of Mackey Price, Mr. Jones mentioned his understanding that he would be paid 40 percent of the fees on the cases he originated. Mr. Price changed the subject and would not discuss the compensation issue further. Both Mr. Price and Randall Mackey, another shareholder at Mackey Price, testified that no agreement was reached with Mr. Jones regarding the Fen-Phen cases.

¶13 Mr. Jones regularly had lunch with Jeffrey Olsen, another associate at Mackey Price. According to Mr. Olsen, Mr. Jones told him, on multiple occasions, that he had not yet worked out an agreement with Mackey Price regarding his compensation from the Fen-Phen cases. Mr. Olsen testified that he encouraged Mr. Jones to finalize a compensation structure with Mackey Price.

¶14 Mr. Jones also discussed his compensation with the neighbor who lent him the money for the Georgia cases. The neighbor testified that Mr. Jones initially indicated that he, Mr. Jones,

---

[4] There is a dispute as to who originated these claims. Mr. Jones's argument is founded on the deposition testimony of Rebekah Brown, who simply states that it was her impression that the Dr. Brown cases were developed from the Dr. Poulsen cases. At trial, the district court ultimately found that Mr. Jones had "absolutely no responsibility for and nothing to do with the Dr. Brown category of cases."

would receive 40 percent of the fees generated from the cases, but that he later indicated he would receive less than 40 percent.

¶15 On February 12, 2005, over two years after he began working on the Fen-Phen cases, Mr. Jones made a hand-written memorandum concerning his compensation. In it he recounted the conversation he had with Mr. Price about his compensation:

> Finally [Mr. Price] met w/me and tried to open up the issue by saying 'we need to discuss what to do with the 60% that does not go to [Thompson & Skousen].' I responded that all I knew is that I got 40% and did not care what the other arrangements were.

After recounting his discussion with Mr. Price, Mr. Jones wrote:

> Split w/firm of Phen work – after overhead paid is 10% to originator 80% to me 10% to firm. Usually meant firm got 20% b/c firm [Gifford Price and Randall Mackey] originated. If this is how Phen treated, then I get 80%, not 40%. Bottom line: If not 40%, then 80%[.] If not 80% then 50%.

¶16 On May 26, 2005, only a few months after writing the memorandum, Mr. Jones abruptly developed a mental disability called dissociative amnesia, which prevented him from remembering anything prior to that date. His condition persists to this day. Due to this condition, he stopped working for Mackey Price. The legal work on Mr. Jones's Fen-Phen cases was substantially completed before he became disabled.[5]

¶17 In June 2006, Mackey Price received approximately $1,060,869.20 for the Fen-Phen cases that Mr. Jones had worked on, which it deposited in its trust account. Mr. Jones filed suit on July 19, 2006, naming Mackey Price, Thompson & Skousen, Mr. Mackey, Mr. Price, Mr. Thompson, Mr. Skousen, Russell C. Skousen, L.L.C., and C. Jeffery Thompson, L.L.C. as defendants. About one month after the lawsuit was filed, Mackey Price gave Mr. Jones less than two days' notice that it was distributing a portion of the fees. Then, about four months later, Mackey Price informed Mr. Jones that the

---

[5] There is a dispute of fact between the parties as to whether any work remained on the Fen-Phen cases. At trial, the district court found that there was substantial work remaining, including checking and rechecking client files and reclassifying various clients' claims.

rest of the fees were being distributed. From the total of $1,060,869.20 in fees Mackey Price received, it distributed $165,000 to Mr. Jones, approximately $400,000 to Thompson & Skousen, and around $175,000 each to Mr. Mackey and Mr. Price, with the remainder going to Mackey Price and its creditors.[6] After these distributions took place, Mr. Jones amended his complaint to assert seven causes of action, including a claim that Mackey Price breached a contract not to distribute the Fen-Phen fees from the firm's trust account without providing him advanced notice.

¶18 The Defendants filed motions for partial summary judgment on several of the claims in Mr. Jones's amended complaint, including his contract claim against Mackey Price, his claim against all Defendants for quantum meruit, and his claim against all Defendants for fraudulent transfer. In its motion for summary judgment, Mackey Price argued that it was undisputed that it and Mr. Jones never agreed that the general Compensation Agreement would govern the fees from the Fen-Phen litigation. Mackey Price directed the court to evidence supporting this assertion. In response, Mr. Jones failed to present affirmative evidence demonstrating a genuine issue of material fact for trial regarding this claim. Thus, the district court granted Mackey Price's summary judgment motion. The court also dismissed his quantum meruit claim against all Defendants on summary judgment, except Mackey Price, holding that Mackey Price was the only Defendant that directly benefited from Mr. Jones's work. And finally, the court dismissed Mr. Jones's Fraudulent Transfer Act claims against all Defendants on summary judgment, except Mackey Price, Mr. Mackey, and Mr. Price. The court concluded that the uncontroverted material facts showed that the distributions to Thompson & Skousen were made in good faith, and that Thompson & Skousen was a good faith creditor of Mackey Price.

¶19 Before trial on the remaining quantum meruit and Fraudulent Transfer Act claims, Mackey Price moved to strike Mr. Jones's request for a jury trial on his quantum meruit claim and to bifurcate the trial, with the quantum meruit claim being tried first to the court. The court granted the motion, holding that quantum meruit was an equitable claim, and was, accordingly, not a claim for which a plaintiff may demand a jury trial.

---

[6] In July 2004, Mr. Jones also received $50,000 directly from Thompson & Skousen as part of a Mackey Price client's settlement. Mr. Jones did not disclose this payment to Mackey Price.

¶20 During the bench trial on his quantum meruit claim, Mr. Jones argued that the proper measure of damages is the benefit conferred upon the Defendants as a result of his work, not the reasonable value of the services he provided. The court disagreed and required Mr. Jones to show that the reasonable value of his services exceeded the amount Mackey Price paid him. Ultimately, the court concluded that he failed to establish that he provided services worth more than the $215,000 he received from the Fen-Phen fees.[7]

## Standard of Review

¶21 Mr. Jones raises several issues on appeal. First, he argues the district court erred in granting Mackey Price's motion for summary judgment on his breach of contract claim. "We review the district court's rulings on summary judgment motions for correctness."[8]

¶22 Second, he argues the district court improperly denied his jury demand on his quantum meruit claim. Generally, "[w]hether there is a right to a jury trial is a question of law that we review for correctness."[9] But we have stated that "[i]n circumstances where doubt exists as to whether the cause should be regarded as one in equity, or one in law," "[u]nless it is shown that the ruling [determining the equitable or legal nature of the issue] was patently in error or an abuse of discretion, this court will not interfere with" the district court's decision.[10] After reviewing this issue anew, however, we conclude that the legal-equitable distinction in the context of a jury demand is an abstract legal question.[11] The district

---

[7] This figure includes the $165,000 that Mackey Price paid Mr. Jones from the Fen-Phen proceeds and the $50,000 that Thompson & Skousen paid Mr. Jones. It is disputed whether the Thompson & Skousen payment was actually a payment or merely a loan.

[8] *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, ¶ 10, 94 P.3d 179 (internal quotation marks omitted).

[9] *Failor v. MegaDyne Med. Prods., Inc.*, 2009 UT App 179, ¶ 9, 213 P.3d 899.

[10] *Sweeney v. Happy Valley, Inc.*, 417 P.2d 126, 128–29 (Utah 1966).

[11] *See Manzanares v. Byington (In re Baby B.)*, 2012 UT 35, ¶¶40–41, 308 P.3d 382 (discussing the distinction between findings of facts–where "the lower court often has a competitive advantage in its firsthand access to factual evidence" and conclusions of law–where

(continued . . .)

court is in no better position than we are to ascertain the nature of the rights asserted and the remedies sought or to conduct a historical analysis of a claim's equitable or legal nature at the time of the ratification of the Utah Constitution. We therefore review the district court's decision for correctness.

¶23 Third, Mr. Jones argues the district court improperly bifurcated the trial by trying his quantum meruit claim to the bench prior to trying his fraudulent transfer claim to a jury. "Rule 42(b) of the Utah Rules of Civil Procedure gives the trial court 'considerable discretion' to administer the business of its docket and determine how a trial should be conducted. We will not disturb the trial court's bifurcation order unless the trial court abused its discretion."[12] But we note that where a district court's decision to bifurcate the legal and equitable claims and to try the equitable claims to the court first has the potential to deny a party a full jury trial on the legal claims, we will apply a heightened standard of review.[13]

¶24 Fourth, Mr. Jones contends that the district court applied the wrong measure of damages to his quantum meruit claim. Determining the applicable measure of damages is a legal question, which we review for correctness.[14]

¶25 Finally, he argues that the individual Defendants were improperly dismissed on summary judgment from his quantum

---

"the lower court has no comparative advantage in resolving legal questions").

[12] *Walter Drug Co. v. La Sal Oil Co.*, 972 P.2d 1238, 1244 (Utah 1998) (citation omitted).

[13] *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959) (noting that even though the trial court is accorded discretion in deciding whether the legal or equitable claims should be tried first "that discretion is very narrowly limited and must, wherever possible, be exercised to preserve jury trial" "[s]ince the right to jury trial is a constitutional one").

[14] *See Anesthesiologists Assocs. of Ogden v. St. Benedict's Hosp.*, 884 P.2d 1236, 1237–38 (Utah 1994) ("[W]e must determine how the law of damages [applies in this case]. Because we are reviewing only legal questions, we accord the conclusions of the court below no particular deference but review them for correctness.").

meruit and Fraudulent Transfer Act claims. Again, we review a district court's rulings on summary judgment for correctness.[15]

## Analysis

¶26 Below, we first address Mr. Jones's contract claim and uphold the district court's dismissal of this claim on summary judgment. Next, we analyze the district court's denial of Mr. Jones's jury demand on his quantum meruit claim. We conclude that he was entitled to a jury trial because a claim for unjust enrichment seeking money damages, such as the one Mr. Jones now advances, was a claim at law at the time of the ratification of the Utah Constitution. Finally, we review the district court's decision to dismiss Mr. Jones's quantum meruit and Fraudulent Transfer Act claims against the individual Defendants and uphold this decision.

### I.   We Uphold the District Court's Dismissal of Mr. Jones's Contract Claim

¶27 The district court dismissed Mr. Jones's contract claim on summary judgment. In reviewing a grant of summary judgment we must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."[16] Summary judgment is appropriate if "reasonable jurors, properly instructed, would be able to come to only one conclusion."[17]

¶28 Mr. Jones claimed that he and Mackey Price agreed that the general Compensation Agreement, which had applied to his hourly work at the firm, would apply to the fees generated in the Fen-Phen litigation. Mr. Jones had the burden of proof on this claim at trial. Mackey Price moved for summary judgment on the contract claim. As the movant on an issue where the nonmoving party bears the burden of proof at trial, Mackey Price had the initial burden to show through "reference to the pleadings, depositions, answers to interrogatories, and admissions on file . . . that there [was] no genuine issue of material fact" concerning this claim.[18] Mackey Price

---

[15] *Prince, Yeates & Geldzahler*, 2004 UT 26, ¶ 10.

[16] UTAH R. CIV. P. 56(c); *see also Clegg v. Wasatch County*, 2010 UT 5, ¶ 15, 227 P.3d 1243.

[17] *Clegg*, 2010 UT 5, ¶ 15.

[18] *Orvis v. Johnson*, 2008 UT 2, ¶ 18, 177 P.3d 600 (internal quotation marks omitted) ("A summary judgment movant, on an issue where the nonmoving party will bear the burden of proof at

(continued . . .)

met this burden by setting forth evidence showing it was undisputed that the parties had not agreed the Compensation Agreement would govern the Fen-Phen fees. This evidence included Mr. Jones's admission that there was no express agreement regarding the distribution of the Fen-Phen fees, and testimony from Mr. Olsen and Mr. Jones's neighbor negating the existence of an agreement.

¶29 Once Mackey Price had successfully met its burden as the moving party, the burden then shifted to Mr. Jones, "who may not rest upon the mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial."[19] The court granted Mackey Price's motion, finding that Mr. Jones had failed to set forth affirmative evidence demonstrating a genuine issue of material fact as to this claim. We uphold the district court's decision and hold that, as a matter of law, the affirmative evidence Mr. Jones set forth in response to the Defendant's summary judgment motion failed to create an issue of material fact.

¶30 Mr. Jones claims there are two pieces of evidence that create a genuine issue of material fact regarding his claim that the Compensation Agreement governed the Fen-Phen fees. He first points to his February 2005 memorandum, which he claims "set[s] forth his understanding at the time that, absent an agreement to the contrary, the Compensation Agreement applied to his Fen-Phen cases." Second, he points to the testimony of Rebekah Brown, where she stated that he was paid under the Compensation Agreement for a previous contingency fee case. We agree with the district court that neither of these pieces of evidence creates a genuine issue of material fact regarding the contract claim.

---

trial, may satisfy its burden on summary judgment by showing, by reference to 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' that there is no genuine issue of material fact. Upon such a showing, whether or not supported by additional affirmative factual evidence, the burden then shifts to the *nonmoving* party, who 'may not rest upon the mere allegations or denials of the pleadings,' but 'must set forth specific facts showing that there is a genuine issue for trial.'"(citation omitted)).

[19] *Id.* (internal quotation marks omitted).

¶31 In order to create a contract, the parties must have "a meeting of the minds on the integral features of an agreement."[20] This meeting of the minds requires agreement on the essential terms of the contract.[21] "So long as there is any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a . . . contract."[22] The evidence referenced in Mackey Price's motion for summary judgment shows there was no meeting of the minds between Mr. Jones and Mackey Price. And the February 2005 memorandum and Ms. Brown's testimony do nothing to create a factual dispute regarding this issue.

¶32 First, the February 2005 memorandum does not reflect a meeting of the minds, but merely notes a range of possible compensation scenarios. In the memorandum, written before he lost his memory, Mr. Jones records his impressions concerning various conversations he had pertaining to the distribution of the Fen-Phen proceeds. These notes discuss various fee distribution arrangements in numbered paragraphs, including "that originator of new cases would get 50% of attny fees," that Mr. Jones would get 40 percent of the attorney fees from two specific cases, and that Mr. Jones had stated in front of Mr. Price that he got 40 percent and Mr. Price "never mentioned it again" and "did not dispute my position." Mr. Jones then makes note of another arrangement and states that "[i]f this is how phen [is] treated, then I get 80%, not 40%." Finally, the memorandum concludes with the statement, "[b]ottom line: If not 40%, then 80%[;] If not 80% then 50%."

¶33 When viewed in the light most favorable to the nonmoving party, the first line of the "bottom line" statement could be read as consistent with Mr. Jones's claim that if there was not another specific agreement regarding Fen-Phen (the 40% agreement), then the general Compensation Agreement would apply (the 80%/20% agreement). But there is no way to read the second line as consistent with his argument. The second line states that if not 80 percent (which is consistent with the Compensation Agreement) then 50 percent.

---

[20] *Prince, Yeates, & Geldzahler v. Young*, 2004 UT 26, ¶ 13, 94 P.3d 179 (internal quotation marks omitted).

[21] *Id.*

[22] *Id.* ¶ 17 (internal quotation marks omitted).

¶34 Therefore, this memorandum does not, as Mr. Jones claims, "set forth his understanding, at the time that, absent an agreement to the contrary, the Compensation Agreement applied to his Fen-Phen cases." Instead, it discusses a range of possible compensation arrangements and ends with a "bottom line" indicating there was never an agreement between the parties as to what arrangement would govern. The February 2005 memorandum—with its list of various compensation scenarios, and its "bottom line" that names four different compensation possibilities—did not create a factual dispute regarding the application of the Compensation Agreement to the Fen-Phen fees.

¶35 Next, we must consider whether Ms. Brown's testimony creates a genuine issue of fact as to whether the parties agreed that the Compensation Agreement applied to the Fen-Phen fees. Mr. Jones challenges the district court's decision to strike Ms. Brown's testimony for lack of foundation and claims that her testimony, if admitted, would have created a genuine issue of material fact. We uphold the district court's decision to exclude Ms. Brown's testimony. Further, even if the district court erred in excluding this testimony, such error was harmless because her testimony does not create a genuine issue of material fact.

¶36 Ms. Brown testified that she "believed" there was a personal-injury contingency fee case that came into the firm while the Compensation Agreement was in place and that the fee distribution for that case was handled under the general Compensation Agreement. Mr. Jones argues that this testimony establishes a dispute about whether the Compensation Agreement applied to both his hourly work and his contingency fee work. Her testimony on this issue was as follows:

> Q: Do you recall there being any contingency fee cases during the 2002, 2005 time period?
>
> A: You are asking for specific clients?
>
> Q: No, just – not by name, but whether there were any contingency fee cases to your recollection that Greg Jones worked on during 2002 through 2005?
>
> A: I think there was, I think there was a personal injury case he was working on during that time.
>
> Q: Do you recall whether or not there was monies that were received on that case?
>
> A: I believe so.

Q: And were those funds put in the formula just like hourly work cases?

A: I believe it was the same, handled the same way.

The district court concluded that this testimony was not admissible, because Ms. Brown used the terms "I think" and "I believe" and there was no information on the record showing the basis for this belief.

¶37 Rule 104 of the Utah Rules of Evidence requires that before admitting evidence, the court "must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." To prove admissibility, the party seeking to present the evidence must lay a factual foundation showing that the evidence is admissible under the relevant rules of evidence.

¶38 Under rule 602 of the Utah Rules of Evidence, witnesses are required to have "personal knowledge of the matter" about which they are testifying. This can be established by showing that the witness "had an opportunity to perceive a relevant fact, actually perceived it, remembers perceiving it, and can communicate that perception."[23] We have explained that this rule "merely requires that the witness have the opportunity and the capacity to perceive the events in question" and does not require a court to exclude testimony simply because the "witness's memory of the subject matter of the testimony is less than complete."[24]

¶39 Mr. Jones argues that Ms. Brown had the required personal knowledge because she "had been the office manager and secretary to Gifford Price and Jones, and prepared spreadsheets that were used to calculate the compensation of the attorneys at the firm." But this general knowledge of the workings of the office does not necessarily establish that she had any personal knowledge about the prior contingency fee case. Moreover, she was Mr. Jones's witness, and therefore his attorney had every opportunity to lay the proper foundation regarding the basis of her personal knowledge of the prior contingency fee case. For instance, he could have asked the name of the case, the date of the case, or the attorneys who worked on the case. Because the basis for Ms. Brown's personal knowledge

---

[23] R. COLLIN MANGRUM & DEE BENSON, MANGRUM & BENSON ON UTAH EVIDENCE 414 (2013).

[24] *State v. Eldredge*, 773 P.2d 29, 33 (Utah 1989).

was not on the record, we uphold the district court's decision to exclude her testimony on this point.

¶40 But even if the district court erred in excluding Ms. Brown's testimony, this error was harmless because her testimony did not create a genuine issue of material fact regarding the applicability of the Compensation Agreement to the Fen-Phen work. Mr. Jones claims that she "testified that Jones was paid under the Compensation Agreement between 2002 and 2005 for at least one contingency fee case at the firm." He points to this evidence to establish that, because one contingency fee case was handled under the Compensation Agreement, the parties must have agreed that the Fen-Phen cases would be as well. This logic fails, however, when one looks at the entirety of Ms. Brown's testimony. When asked specifically about the Fen-Phen cases, she testified that they were not treated like other Mackey Price cases:

> Q: And was Fen Phen treated like – did you have an understanding as to whether the Fen Phen work that was being done at Mackey Price was done as a firm client?
>
> A: It was not.
>
> . . .
>
> Q: How was it treated differently than other cases that were being handled at Mackey Price?
>
> A: This is my impression of that time period, but I do remember clearly that it was not favored at all by Randall and Gifford, and that there were strict, you know, limits put on getting involved with this, especially as far as using firm assets or staff, resources.

¶41 Further, when asked specifically about the fee arrangement for the Fen-Phen work, she responded, "I don't know the details" and "I don't know anything." Taken in its entirety, Ms. Brown's testimony fails to raise a genuine issue of material fact. When viewed in the light most favorable to Mr. Jones, her testimony may establish that one contingency fee case he worked on was run through the standard Compensation Agreement. But she also stated that the Fen-Phen work was handled differently than work done for standard firm clients and that she did not know the specific arrangement regarding the fees from this work. The possible application of the Compensation Agreement to a single contingency fee case does not create a factual dispute as to whether the parties agreed that it would apply to the Fen-Phen contingency fee cases as well. This is

especially true given Ms. Brown's statement that the Fen-Phen work was handled differently than work done for other firm clients. Because neither the February 2005 memorandum nor Ms. Brown's testimony create a factual dispute regarding the contract claim, we uphold the district court's dismissal of this claim on summary judgment.

## II. We Reverse the District Court's Finding That Quantum Meruit Is an Equitable Claim For Purposes of a Jury Demand

¶42 Having concluded that Mr. Jones's contract claim fails, we now turn to his claim that the district court incorrectly denied his jury demand. We reverse the district court on this issue because at the time of the ratification of the Utah Constitution a claim seeking money damages under the unjust enrichment branch of quantum meruit was a claim at law, not in equity. Next, we clarify that the damages owed under an unjust enrichment claim are based on the benefit conferred upon the defendant, but may be measured by the reasonable value of the plaintiff's services in certain instances.

*A. Because a Contract-Implied-in-Law Claim for Money Damages Was a Legal Claim at the Time of the Ratification of the Utah Constitution, the District Court Erred in Concluding That it Was Equitable and in Denying Mr. Jones's Jury Demand*

¶43 We have held that article I, section 10 of the Utah Constitution guarantees "the right of jury trial in civil cases."[25] But we have also "made it clear that this constitutional right to a jury trial . . . extends only to cases that would have been cognizable at law at the time the constitution was adopted."[26] We have also noted that the district court is not tied to the parties' characterization of the claims when trying to decide whether the "legal or equitable issues predominate," but "should examine the nature of the rights asserted and the remedies sought in light of the facts of the case."[27] Therefore, our task is to "examine the nature of the rights asserted and the remedies sought" in order to characterize Mr. Jones's claim, and then to decide if that claim would have been cognizable at law or in equity at the time the Utah Constitution was adopted.

---

[25] *Int'l Harvester Credit Corp. v. Pioneer Tractor & Implement, Inc.*, 626 P.2d 418, 421 (Utah 1981).

[26] *Zions First Nat'l Bank v. Rocky Mountain Irrigation, Inc.*, 795 P.2d 658, 661 (Utah 1990) (citing *Hyatt v. Hill*, 714 P.2d 299 (Utah 1986)).

[27] *State Bank of Lehi v. Woolsey*, 565 P.2d 413, 415 (Utah 1977).

¶44 Quantum meruit has two distinct branches—contracts implied in law and contracts implied in fact.[28] Mr. Jones brought a claim for the contract-implied-in-law branch of quantum meruit. Contracts implied in law, also termed quasi-contracts or unjust enrichment, "is a doctrine under which the law will imply a promise to pay for goods or services when there is neither an actual nor an implied contract between the parties."[29] A contract implied in law claim does not require a meeting of the minds. This is in contrast to contracts implied in fact, which are contracts established by conduct, and do require a meeting of the minds.[30]

¶45 Contracts implied in law require the plaintiff to establish that the defendant (1) received a benefit, (2) appreciated or had knowledge of this benefit, and (3) retained the benefit "under circumstances that would make it unjust for the defendant" to do so.[31] Contracts implied in law were historically included in the cause of action for general assumpsit.[32] In 1899, we characterized a contract-implied-in-law claim as a claim for implied assumpsit. In *Short v. Bullion-Beck & Champion Mining Co.*, Justice Baskin described implied assumpsit as a claim that today we would call unjust enrichment:

---

[28] *Emergency Physicians Integrated Care v. Salt Lake County*, 2007 UT 72, ¶ 10, 167 P.3d 1080.

[29] *Concrete Prods. Co. v. Salt Lake County*, 734 P.2d 910, 911 (Utah 1987).

[30] *See Knight v. Post*, 748 P.2d 1097, 1100–01 (Utah Ct. App. 1988); *see also* Judy Beckner Sloan, *Quantum Meruit: Residual Equity in Law*, 42 DEPAUL L. REV. 399, 406–407 (1992).

[31] *Emergency Physicians*, 2007 UT 72, ¶ 11 (internal quotation marks omitted).

[32] *See Austin v. Shalala*, 994 F.2d 1170, 1176 (5th Cir. 1993) (noting that "[a] suit in quasi-contract falls under the common law writ of general assumpsit") (citing RESTATEMENT (FIRST) OF RESTITUTION § 5(a) (1937) ("The appropriate proceeding in an action at law for the payment of money by way of restitution is . . . in States retaining common law forms of action, an action of general assumpsit . . . .")); *see also* Sloan, *supra* note 30, at 423–25 (noting the development of general assumpit from including implied in fact contracts to including implied in law contracts).

> Where a party is employed by another to perform some specific act for a stipulated sum, and afterwards, at the request of the employer, something additional is done by the employe[e], without any express promise of payment, *the law will imply a promise by the employer to pay what the additional service is reasonably worth, and the employe[e] may recover on an implied assumpsit* by alleging . . . the facts from which the law implies a promise to pay. This is elementary, and therefore reference to authorities which support the principle is not necessary.[33]

Also, contracts implied in law were historically characterized as an action for money had and received.[34] These causes of action, which were equitable in nature, were nonetheless developed by the common law court.[35]

¶46 At the time of the signing of the Utah Constitution, it was understood that a contract implied in law's predecessor claims (including assumpsit and an action for money had and received) were claims at law, not in equity. This understanding is demonstrated by our early caselaw and supported by contemporaneous holdings in other state courts.

¶47 In 1897, we noted in a case involving debts owed in a lumbermen's exchange that "[t]his is a simple action for money had and received, and corresponds with the old common-law action of indebitatus assumpsit. It is an action at law, and not a suit in equity."[36] We did not discuss this statement further or apply it to the facts of the case. In 1909, however, we discussed the legal/equitable distinction in greater depth in a case concerning a materialman's

---

[33] 57 P. 720, 723 (Utah 1899) (Baskin, J., dissenting) (emphasis added).

[34] Sloan, *supra* note 30, at 424.

[35] *Id.* at 423 ("The equitable nature of the new common law *legal* actions, such as general assumpsit and all its tributaries such as indebitatus assumpsit and quantum meruit, reflected the common law courts' efforts to move into the Chancellor's equitable territory." (emphasis added)).

[36] *Mader v. Taylor-Romney-Armstrong Co.*, 49 P. 255, 255 (Utah 1897).

lien.[37] In this case, the plaintiffs were pursuing a material man's lien against the defendant's property for the cost of building materials that were used on the property, but not paid for.[38] The lower court found that the plaintiffs' lien was for less than the defendant's homestead exemption and thus held that the plaintiffs were not entitled to judgment under the lien.[39] The plaintiffs then claimed that they were entitled to a "personal judgment" against the property owner for money damages.[40] We characterized the plaintiffs' proposed personal judgment claim as one for assumpsit[41] and found that it was a claim at law, while the lien was a claim in equity.[42] We discussed the distinction in the context of the then-recent provision of the Utah Constitution that merged the courts of law and equity.[43] We held that the merging of law and equity allowed the plaintiffs to plead both their legal claim (for money damages under assumpsit) and their equitable claim (for a lien requiring a sale of the property and a deficiency judgment from the sale proceeds) in the same complaint.[44] Both our statement in 1897 and discussion in 1909 demonstrate that at the time of the ratification of the Utah Constitution, we viewed assumpsit as a legal claim. The fact that the then-justices of the Utah Supreme Court saw assumpsit as a legal claim is strong historical evidence that, at the time of ratification, assumpsit was a legal claim.

---

[37] *Volker-Scrowcroft Lumber Co. v. Vance*, 103 P. 970, 971 (Utah 1909).

[38] *Id.*

[39] *Id.*

[40] *Id.* at 972.

[41] *Id.* ("In all these cases in which it is held that a personal judgment may be rendered though the lien fails it of course is also held that the complaint . . . must also contain all the necessary facts constituting both ground for relief and all the necessary allegations of an action in assumpsit.").

[42] *Id.* ("The only relief demanded was the awarding of a lien and sale of the premises, and a deficiency judgment after sale. Nowhere is it made to appear that the action of the court was in any manner invoked for a personal judgment *apart from* the relief demanded in equity." (emphasis added)).

[43] *Id.*

[44] *Id.*

¶48 This conclusion is bolstered by the contemporaneous decisions of other state courts recognizing contract implied in law's predecessor claims (assumpsit and an action for money had and received) to be legal. For instance, in 1890 the New York Court of Appeals held that an action for money had and received was an action at law:

> [T]he action has been frequently stated to be an 'equitable one,' that is one depending upon general principles of equity for the maintenance of the plaintiff's claim to the money. . . . But although the action may be generally described as one of an equitable character, it never was in any aspect a suit in equity. . . . That an action is of an equitable nature does not make it an action in equity.
>
> *When, in an action for money had and received, all the facts show that the plaintiff is* ex aequo et bono [*"from equity and conscience"] entitled to recover, his right to recover is a legal one, and maintainable in the court of law.*[45]

¶49 Just five years after the ratification of the Utah Constitution, another court similarly recognized the legal nature of these causes of action. In 1900, the North Carolina Supreme Court stated, "where one party has received money to which another is entitled, the law presumes a contract if it is necessary to do so to enable the party entitled to recover the same."[46] The court goes on to find that "[t]his entitles the party having the right to the money to an action of debt, *indebitatus assumpsit*, which, though an action at law, was equitable in nature. It has been styled 'an equitable action on the law side of the docket.'"[47]

¶50 Similarly, the Wisconsin Supreme Court noted the legal roots of contract implied in law's predecessor claims in 1914. The court noted that "[t]he complaint is for money had and received. The action though *legal in form*, the right to recover is in its nature equitable, and can only be enforced where the defendant has received money which in equity and good conscience he ought to

---

[45] *Chapman v. Forbes*, 26 N.E. 3, 4–5 (N.Y. 1890) (emphasis added).

[46] *Davison v. W. Oxford Land Co.*, 36 S.E. 162, 163 (N.C. 1900).

[47] *Id.* (emphasis added).

pay to the plaintiff."[48] Modern courts have also recognized this history and held that assumpsit is based in law and thus requires a jury trial.[49] Based on the contemporaneous discussions of assumpsit by the Utah Supreme Court and our sister states, we conclude that assumpsit was legal in nature at the time of the ratification of the Utah Constitution.

¶51 Having examined the nature of contract implied in law's predecessor claims, we turn to an analysis of the remedy sought. We must now determine whether the relief sought by Mr. Jones is the type of relief that could have been granted by a court of law at the time of ratification. As we have noted, in addition to the nature of the rights asserted, we also "examine the nature of . . . the remedies sought" to determine if a claim is legal or equitable.[50] The remedy for quantum meruit is restitution.[51] Historically, the remedy of restitution developed along two tracks: one in the courts of law and another in the courts of equity.[52] Restitution is available as a legal

---

[48] *Steuerwald v. Richter*, 149 N.W. 692, 694 (Wis. 1914) (emphasis added).

[49] *Austin*, 994 F.2d at 1176 ("A suit in quasi-contract falls under the common law writ of general assumpsit. . . . In England in 1791, these actions were at law and were tried to a jury."); *Jogani v. Superior Court*, 81 Cal. Rptr. 3d 503, 508 (Cal. Ct. App. 2008) (concluding that at the time of the adoption of the California constitution in 1850 quantum meruit was an action at law); *Nehi Beverage Co. of Indianapolis v. Petri*, 537 N.E.2d 78, 85 (Ind. Ct. App. 1989) ("Our courts have used the phrases quasi-contract, contract implied-in-law, constructive contract, and *quantum meruit* synonymously. These are *legal* fictions providing a remedy to prevent unjust enrichment, thereby promoting justice and equity. But, they are legal fictions created by courts of law. They were triable at law and not in equity, thus one is entitled to jury trial upon them."(citations omitted)); *Auburn Mech., Inc. v. Lydig Constr., Inc.*, 951 P.2d 311, 317 (Wash. Ct. App. 1998) ("Most authorities agree that quasi contract, while invoking equitable principles, is a legal remedy.").

[50] *State Bank of Lehi*, 565 P.2d at 415.

[51] *U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n*, 2012 UT 3, ¶ 12, 270 P.3d 464 ("[R]estitution is an extracontractual remedy for a claim of unjust enrichment.").

[52] *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) ("In the days of the divided bench, restitution was available in

(continued . . .)

remedy where the plaintiff asks exclusively for monetary relief.[53] "These claims [for monetary relief under quantum meruit] are claims at law in every sense, first because they seek simple monetary relief, and second because they are historically brought in the separate law courts."[54] But restitution can also be an equitable remedy, such as when a plaintiff brings a quantum meruit claim and seeks a constructive trust or equitable lien.[55] Because a plaintiff relying on a contract-implied-in-law theory may seek either a legal remedy (money damages), or an equitable remedy (a constructive trust or equitable lien), courts have tied the question of whether the plaintiff has a right to a jury trial to the remedy requested.[56] Our cases take a similar approach. For instance, in *International Harvester*, we held that a plaintiff's foreclosure claim was legal "[s]ince [it] concerned only money damages."[57] In this case, Mr. Jones seeks only money

---

certain cases at law, and in certain others in equity."); 1 DAN B. DOBBS, LAW OF REMEDIES § 2.6(3) (2d ed. 1993) ("[S]ome restitution claims were equitable. [However] [m]any restitution claims were brought under the common law writ of assumpsit. . . . These claims are claims at law in every sense . . . .").

[53] RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 4 cmt. d (2011) ("If restitution to the claimant is accomplished exclusively by a judgment for money, without resort to any of the ancillary remedial devices traditionally available in equity but not at law, the remedy is presumptively legal.").

[54] 1 DAN B. DOBBS, LAW OF REMEDIES § 2.6(3) (2d ed. 1993).

[55] *Id.* § 4.3(2) 597 ("The constructive trust, like its counterpart remedies 'at law,' is a remedy for unjust enrichment."); *id.* § 4.3(3) ("The equitable lien [may be] imposed . . . to prevent unjust enrichment."); *see also* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 4 cmt. d (2011) ("Beginning with constructive trust, and proceeding through every possible analogy to constructive trust, remedies in restitution that give the claimant ownership or security or priority in an identifiable asset or fund are presumptively derived from equity.").

[56] *Knudson*, 534 U.S. at 215 ("[W]hether [restitution] is legal or equitable in a particular case . . . remains dependent on the nature of the relief sought.").

[57] *Int'l Harvester*, 626 P.2d at 421.

damages for his quantum meruit claim.[58] Thus, he seeks a legal remedy, not an equitable one. Therefore, both the type of claim he presses and the remedy he seeks were available at law at the time of the ratification of the Utah Constitution.

¶52 Mackey Price nevertheless argues that language in our opinions has explicitly described quantum meruit in equitable terms. For instance, we have stated that quantum meruit is an "equitable tool that allows a plaintiff to receive restitution for the reasonable value of services provided to the defendant."[59] And we have characterized recovery of quantum meruit as "equitable in nature."[60] But the language in our caselaw is best explained by looking again to history. In *Moses v. Macferlan*, Lord Mansfield stated that recovery under unjust enrichment is required by "the ties of natural justice and equity."[61] But commentators have explained Lord Mansfield's use of the word "equity" as follows: "Although Mansfield's description of quasi contract as 'equitable' has been repeated many times, this refers merely to the way in which a case should be approached, since it is clear that the action is at law and the relief given is a simple money judgment."[62]

¶53 The language from our caselaw can be similarly explained. When we described quantum meruit or unjust enrichment as "equitable," we meant merely to describe the way in which the claim should be approached, given that such claims arise only where there is no legal contract. Our prior opinions should not be read to impliedly hold that a claim for quantum meruit is "equitable" for purposes of the right to a jury trial.[63]

---

[58] In Mr. Jones's Amended Complaint, he also asks the court to hold the fees received by Mackey Price in constructive trust. But this claim is separate from his claim for quantum meruit. His quantum meruit claim seeks only "the monetary benefits" that "Mr. Jones has conferred upon the Defendants."

[59] *Emergency Physicians,* 2007 UT 72, ¶ 10; *see also TruGreen Cos. v. Mower Bros.*, 2008 UT 81, ¶ 18, 199 P.3d 929 (noting that restitution and unjust enrichment are tools of equity).

[60] *Christensen v. Abbott*, 671 P.2d 121, 123 (Utah 1983).

[61] *Moses v. Macferlan,* 97 Eng. Rep. 676 (K.B. 1760).

[62] GEORGE E. PALMER, THE LAW OF RESTITUTION § 1.2 (1978).

[63] We recognize that we have also characterized quantum meruit as an equitable remedy when announcing that legal remedies must

(continued . . .)

¶54 In sum, because we conclude that Mr. Jones's unjust enrichment claim and his remedy of money damages would have been available at law when the Utah Constitution was ratified, we hold that the district court erred in rejecting Mr. Jones's demand for a jury on this claim.

¶55 Because we reverse the district court's denial of Mr. Jones's demand for a jury trial, the subsidiary question of whether the court erred in bifurcating the trial is moot.

*A. Damages Owed Under an Unjust Enrichment Claim Are Based on the Benefit to the Defendant, but Can Be Measured by the Reasonable Value of the Plaintiff's Services in Certain Instances*

¶56 Because we have reversed the district court's decision to deny Mr. Jones's request for a jury trial, we need not reach the issue of damages. But we will nevertheless do so to give the district court guidance on remand.[64] Mr. Jones argues that the district court applied the incorrect measure of damages to his unjust enrichment claim when it focused mainly on the hours he worked, with the goal of quantifying the reasonable value of his services. Instead, he argues, the district court should have focused on the benefit that he conferred upon the Defendants. We clarify that a court should focus on the defendant's gain when assessing damages for an unjust enrichment claim, but we recognize that in cases involving professional services the appropriate measure of the defendant's gain will often be the value of the plaintiff's professional services.

¶57 As a starting premise, "restitution should be measured to reflect the substantive law purpose that calls for the restitution in the first place."[65] For an unjust enrichment claim, the substantive law purpose is to restore to the plaintiff the benefit he or she conferred

_____

be exhausted before equitable remedies are available. *Interiors Contracting Inc. v. Navalco*, 648 P.2d 1382, 1388 (Utah 1982). But these characterizations are also not controlling as they are not rooted in an historical analysis of the Utah Constitution's jury grant. Also here, the *Restatement (Third) of Restitution and Unjust Enrichment* points out the weakness of the application of the exhaustion doctrine to unjust enrichment claims, which have their basis, historically, in law. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 4 cmt. e (2011).

[64] *See State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867.

[65] 1 DOBBS, LAW OF REMEDIES § 4.5(1) (2d ed. 1993).

upon the defendant, when the retention of this benefit would be unjust.[66] We therefore clarify that when assessing damages for unjust enrichment, the court begins by looking to the value of the benefit conferred. Utah caselaw has recognized that the general measure of recovery for an unjust enrichment claim "is the value of the benefit conferred on the defendant (the defendant's gain) and not the detriment incurred by the plaintiff."[67]

¶58 But in the case where the defendant has requested professional services, either directly or impliedly, the proper measure of the defendant's gain will normally be the reasonable value of the plaintiff's services.[68] In other words, in the case of professional services, the value of the benefit conferred is often the same as the value of the services rendered. In most cases involving a lawyer's services, the value of those services will be measured by the number of hours the plaintiff lawyer worked multiplied by his or her hourly rate. But in contingency fee cases, such as the one before us, the reasonable value of the plaintiff lawyer's services requires us to consider factors beyond hours worked. In such cases, the best measure of the value of the benefit conferred upon the defendant law firm by the plaintiff lawyer's services is the value of those services as determined by the standards applicable to contingency fee cases in the legal community. In our case, Mackey Price implicitly requested Mr. Jones's professional services by allowing him to work on the firm's Fen-Phen litigation. Therefore, the proper measure of

---

[66] *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1 cmt. a (2011) ("Liability in restitution derives from the receipt of a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant.").

[67] *Davies v. Olsen*, 746 P.2d 264, 269 (Utah Ct. App. 1987).

[68] *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 50 (2011); *see also* Candace S. Kovacic, *A Proposal to Simplify Quantum Meruit Litigation*, 35 AM. U. L. REV. 547, 557 (1986) ("[T]he reasonable market value of the plaintiff's services can be viewed as the correct remedy in most quantum meruit cases, even in many cases in unjust enrichment because reasonable value can be viewed as the defendant's gain in certain situations. The value of the plaintiff's services measures the defendant's gain when the defendant requests the work: the defendant's benefit is receiving what he or she requested those requested services have a market value." (footnote omitted)).

damages is the reasonable value of his services. This is consistent with our valuation of professional services in prior caselaw.[69]

¶59 When assessing the reasonable value of Mr. Jones's services, the court should look to factors the legal community uses to value contingency fee cases. The district court focused heavily on quantifying the hours Mr. Jones worked in determining the value of his services to the Defendants. The court resisted a discussion of other factors that might affect how the contingency fees should be divided among the attorneys—such as the risk each party undertook. This narrow focus on Mr. Jones's hours worked is evident in the court's findings of fact where it discusses the testimony of his expert on the distribution of contingency fees. The court states that Mr. Jones's expert's "opinion is based on an erroneous premise. He attempts to determine how the Fen-Phen fee should be split among all of the attorneys, rather than issuing his opinion determining the reasonable value of the services of Plaintiff."

¶60 But determining the "reasonable" value of Mr. Jones's services in this contingency fee case necessarily requires consideration of factors beyond the hours he has spent on the case. While Mr. Jones's hours is an important factor, the court should also consider factors commonly used to measure the value of a lawyer's contribution to a contingency fee recovery, such as the relative importance of his role in the litigation, his personal financing of the case, his role in securing clients, his contribution to the management of the case, and his expertise and experience in the area of the law concerned.[70]

¶61 Accordingly, in instructing the jury as to the damages on Mr. Jones's unjust enrichment claim, the court should instruct the jury to consider factors such as these, or any others the court deems

---

[69] *See Emergency Physicians*, 2007 UT 72, ¶ 29 (holding that the proper measure of damages in a case involving physicians' services was the "reasonable value of the services [the plaintiff] provided" (internal quotation marks omitted)); *Baugh v. Darley*, 184 P.2d 335, 339 (Utah 1947) (stating that the measure of damages in a case involving real estate services would be "the reasonable value of the services rendered").

[70] *See* UTAH R. PROF'L CONDUCT 1.5 (discussing the factors to consider when determining a reasonable fee generally).

appropriate for measuring Mr. Jones's relative contribution to the recovery of the Fen-Phen fees.[71]

### III. We Affirm the District Court's Partial Dismissal of Mr. Jones's Quantum Meruit and Fraudulent Transfer Act Claims

¶62 On summary judgment, the district court dismissed Mr. Jones's claims for unjust enrichment against Mr. Mackey, Mr. Price, Mr. Thompson, Mr. Skousen, Thompson & Skousen, L.L.C., C. Jeffery Thompson, L.L.C., and Russell C. Skousen, L.L.C. The court concluded that Mackey Price was the only defendant Mr. Jones could properly sue for unjust enrichment, reasoning that the other Defendants "were incidental and not direct beneficiaries of any services performed by [Mr. Jones]."

¶63 The court also dismissed Mr. Jones's Fraudulent Transfer Act claims against Mr. Thompson, Mr. Skousen, Thompson & Skousen, L.L.C., C. Jeffery Thompson, L.L.C., and Russell C.

---

[71] *See Mulholland v. Kerns*, 822 F. Supp. 1161, 1169 (E.D. Pa. 1993) (surveying courts approaches to valuing an attorney's quantum meruit attorney fee recovery and finding that "[t]he New Jersey Superior Court has granted quantum meruit awards of attorneys' fees on an hourly basis and on a percentage basis, depending on which method of calculation seemed more reasonable in the particular case. In New York, in a fee dispute between a dismissed attorney and a client, the outgoing attorney was allow[ed] to choose to take his quantum meruit award on an hourly basis before final resolution of the case or as a percentage of the final recovery, when it was available." (citations omitted)); *Ashby v. Price*, 445 N.E.2d 438, 444 (Ill. App. Ct. 1983) (looking to "the skill and standing of the attorney employed, the nature of the cause, the novelty and difficulty of the questions, the amount and importance of the subject matter, the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charges in the community and the benefits resulting to the client" when determining a reasonable attorney fee for a contingency fee case under a quantum meruit claim); *see also Paolillo v. Am. Exp. Isbrandtsen Lines, Inc.*, 305 F. Supp. 250, 251 (S.D.N.Y. 1969) (considering "(1) time; (2) standing of the lawyer at the bar; (3) amount involved; (4) benefit to the client[;] and (5) skill demanded" when valuing an attorney's quantum meruit claim on a contingency fee case).

Skousen, L.L.C. (Thompson & Skousen Defendants).[72] It concluded that "the uncontroverted material facts show that the negotiations between Thompson & Skousen and [Mackey Price] were in good faith and arm's length as to the distribution of Fen-Phen funds to Thompson & Skousen, L.L.C. with Thompson & Skousen, L.L.C. being a good faith creditor of [Mackey Price]." We discuss each of these dismissals separately below and affirm in each instance.

*A. We Affirm the District Court's Dismissal of Mr. Jones's Claims for Quantum Meruit Against Mr. Mackey, Mr. Jones, and the Thompson & Skousen Defendants*

¶64 As noted above, the district court dismissed Mr. Jones's quantum meruit claims against all Defendants except Mackey Price on summary judgment. Mr. Jones argues this was error because each of those Defendants ultimately benefited from his work on the Fen-Phen cases by accepting part of the fees earned. We affirm the district court's dismissal of Mr. Mackey and Mr. Price because the uncontroverted facts make clear that they were not direct beneficiaries of Mr. Jones's work. We also affirm the dismissal of the Thompson & Skousen Defendants because the uncontroverted facts show both that they were not direct beneficiaries of Mr. Jones's work and that it was not unjust for them to retain their contracted for payment from the Fen-Phen fees.

¶65 A defendant is liable under the unjust enrichment prong of quantum meruit only if he or she received a direct benefit from the plaintiff. In other words, "unjust enrichment does not result if the defendant has received only an incidental benefit from the plaintiff's service[s]."[73] The most relevant case applying this rule is *Emergency Physicians Integrated Care v. Salt Lake County*. In that case, physicians provided services to Salt Lake County inmates.[74] Emergency Physicians Integrated Care (EPIC), a corporation that provided billing and collections services for the physicians, later sued the County seeking quantum meruit for the services its member

---

[72] For purposes of this section, the term "Thompson & Skousen Defendants" includes Thompson & Skousen, L.L.C., Mr. Thompson, Mr. Skousen, C. Jeffery Thompson, L.L.C., and Russel C. Skousen, L.L.C.

[73] *Emergency Physicians Integrated Care v. Salt Lake County*, 2007 UT 72, ¶ 26, 167 P.3d 1080.

[74] *Id.* ¶ 1.

physicians had provided.[75] The district court held that the County had a constitutional and statutory duty to provide the inmates with medical care and acknowledged that it satisfied this duty through the services provided by the plaintiff physicians.[76] But it nevertheless declined to grant the EPIC's claim for quantum meruit because it concluded that the inmates were the direct beneficiaries of the physician's services, not the County.[77]

¶66 We reversed and concluded that the County did directly benefit from the plaintiff's services.[78] In so holding, we noted that the County was not "acting as a passive third party to a primary relationship between the physicians and inmates," but instead "the County ha[d] complete control over when and where medical services [were] provided."[79] Further, we noted that the County had a duty to provide these medical services and that if the physicians had not done so, the County would have had to provide these services by other means. We held that these were "real benefits . . . sufficient to establish the first prong of a quantum meruit claim."[80] We also recognized that "a large variety of items fall under the definition of benefit, including an interest in money."[81]

¶67 It is clear that Mr. Mackey and Mr. Price benefited from Mr. Jones's work in that they received money; the dispute focuses on whether this benefit was direct or incidental. Whether a benefit is direct or incidental depends on the relationship between the parties and whether Mr. Mackey and Mr. Price were acting as "third parties" to the primary relationship between Mr. Jones and the law firm. We agree with the district court's conclusion that the undisputed facts show that Mr. Mackey and Mr. Price were third parties to the primary relationship between the law firm of Mackey Price and Mr. Jones. This primary relationship is evidenced by the fact that all of the direct contractual relationships involved in this case were with the law firm, not with Mr. Mackey or Mr. Price individually. Mr. Jones was an employee of the law firm. The Fen-

---

[75] *Id.*

[76] *Id.* ¶¶ 27−28.

[77] *Id.* ¶ 27.

[78] *Id.* ¶¶ 27−28.

[79] *Id.* ¶ 27.

[80] *Id.*

[81] *Id.* ¶ 26 (internal quotation marks omitted).

Phen litigants were in contractual relationships with the law firm. Mr. Jones's compensation agreements and contracts were all with the law firm, not the individual defendants. Even viewed in the light most favorable to Mr. Jones, these facts fail to raise a genuine issue of material fact concerning whether Mr. Mackey and Mr. Price directly benefited from his work on the Fen-Phen litigation.

¶68 We uphold the dismissal of the Thompson & Skousen Defendants because there was no genuine issue of material fact regarding both whether they directly benefited from Mr. Jones's work and whether it was unjust for them to retain any benefit recieved. In order to prove quantum meruit, Mr. Jones has to show that the Thompson & Skousen Defendants received a benefit, had an appreciation or knowledge of the benefit, and accepted the benefit under circumstances that would make it unjust for them to retain it without compensating Mr. Jones.[82] As discussed above, to meet the first element of this test the benefit must be direct, not incidental. Similar to Mr. Mackey and Mr. Price, the Thompson & Skousen Defendants were third parties to the primary relationship between Mr. Jones and the law firm of Mackey Price. Any benefit they received from Mr. Jones's work through fees collected on the Fen-Phen cases was indirect. Mr. Jones was not an employee of the Thompson & Skousen Defendants and had no contract for payment of fees from the Thompson & Skousen Defendants.

¶69 Further, under the third element of quantum meruit, "it is not enough that a benefit was conferred on the defendant, . . . rather, the enrichment to the defendant must be unjust in that the defendant received a true windfall or 'something for nothing.'"[83] We have further explained that "[t]he mere fact that a third person benefits from a contract between two others does not make such third person liable."[84] Rather "[t]here must be some misleading act, request for services, or the like, to support such an action."[85]

¶70 Mr. Jones has failed to raise a genuine issue of fact regarding his claim that the Thompson & Skousen Defendants received a

---

[82] *Id.* ¶ 11.

[83] *Id.* ¶ 26 (quoting 66 AM. JUR. 2D RESTITUTION AND IMPLIED CONTRACTS § 13 (2001)).

[84] *Commercial Fixtures & Furnishings, Inc. v. Adams*, 564 P.2d 773, 774 (Utah 1977).

[85] *Id.*

windfall or something for nothing or that they misled Mr. Jones regarding his compensation from the Fen-Phen cases. Instead, the Thompson & Skousen Defendants took a lead role in the Fen-Phen litigation and were paid for this work pursuant to an arm's length contract with Mackey Price. In the summary judgment hearing, the district court noted that the contractual fee splitting arrangement between Mackey Price and Thompson & Skousen "is a fee split that was negotiated in good faith at arm's length, and if anything Mackey Price got the better of them with respect to how the fees were split."[86]

¶71 Further, Mr. Jones did not raise a genuine issue of material fact as to his claim that the Thompson & Skousen Defendants attempted to mislead him. In fact, the record shows that Mr. Thompson specifically warned Mr. Jones that there was no agreement with Mackey Price regarding his compensation and that he needed to take action to get a deal in place. Because Mr. Jones failed to raise an issue of fact as to his claim that the Thompson & Skousen Defendants either benefited directly from his work or unjustly retained any benefit received, we uphold the district court's dismissal of the quantum meruit claim against them.

*A. We Affirm the District Court's Dismissal of Mr. Jones's Fraudulent Transfer Act Claims Against the Thompson & Skousen Defendants*

¶72 We now turn to Mr. Jones's Fraudulent Transfer Act claims. In claiming that the Thompson & Skousen Defendants are liable under Utah's Fraudulent Transfer Act, Mr. Jones relies on section 25-6-5(1) of the Utah Code, which provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:

---

[86] Mr. Jones disputes that the contract was necessarily at arm's length because Mr. Thompson was a director at Mackey Price.

> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

While the Act allows a plaintiff to unwind transactions intended to evade a valid judgment, it also provides an exemption from this provision if a transferee "took in good faith and for a reasonably equivalent value."[87] Mr. Jones argues that the exception is inapplicable here because the Thompson & Skousen Defendants knew about his claims to the fees and nevertheless received part of the fees from Mackey Price. He argues that this constitutes bad faith.

¶73 We have not interpreted "good faith" as used in the current version of the Fraudulent Transfer Act. But we have interpreted a former version of the statute that contained very similar language: "Every conveyance made, and every obligation incurred, with actual intent . . . to hinder, delay[,] or defraud either present or future creditors is fraudulent as to both present and future creditors."[88] In interpreting the statute, we held that "[p]roof that a transferee of property knows that the transferor-debtor has preferred the transferee over other creditors or that the transferee actively sought the preference from the debtor does not support the conclusion that the transferee lacks good faith."[89] We went onto explain, however, that if the value of the property the transferee received was greater than the value of the transferee's legitimate preference, the excess is available to other creditors.[90]

¶74 In this case, there is no doubt that the Thompson & Skousen Defendants were on notice of Mr. Jones's claim to part of the fees, given that they were named parties in his lawsuit. But under our holding in *Butler*, simply being on notice of another creditor's claim

---

[87] UTAH CODE § 25-6-9(1).

[88] *Butler v. Wilkinson*, 740 P.2d 1244, 1260 (Utah 1987) (internal quotation marks omitted).

[89] *Id.* at 1261.

[90] *Id.*

does not foreclose the possibility that a creditor could still receive funds in good faith. Here, Thompson & Skousen negotiated its contract with Mackey Price regarding the Fen-Phen litigation long before it ever received the transfer of fees from Mackey Price. And in the interim, Thompson & Skousen managed and performed extensive work on the cases. The uncontroverted facts show that Thompson & Skousen received payment for successfully completing the terms of its contract with Mackey Price. Its awareness of a possible claim by Mr. Jones does not create a factual issue as to Mr. Jones's claim that it received the payment in bad faith.

¶75 Our *Butler* decision also holds, however, that if the value of property the transferee received was greater than the value of the transferee's legitimate preference, then the excess is available to the other creditors. So even if the Thompson & Skousen Defendants did not act in bad faith, Mr. Jones might nevertheless have a valid claim under the Fraudulent Transfer Act if he could show that they received more than the value of their "legitimate preference." But Mr. Jones makes no attempt to do so in his opening brief. Only in his reply brief does he raise this issue, and we "will not consider matters raised for the first time in the reply brief."[91] Accordingly, we conclude that he has failed to raise a genuine issue of fact concerning this claim.

¶76 We do note that it does not appear the Thompson & Skousen Defendants clearly received more than their legitimate preference. Among other things, the firm set up the Fen-Phen litigation program, found physicians and other experts, managed and supervised the litigation, and entered into agreements with local law firms near the referring physicians. Further, Mr. Thompson and Mr. Skousen were integral to this work. We therefore affirm the district court's ruling dismissing Mr. Jones's Fraudulent Transfer Act claims against the Thompson & Skousen Defendants because he has not raised an issue of fact concerning whether the Defendants acted in bad faith or received more than their legitimate preference.

## Conclusion

¶77 We uphold the district court's dismissal of Mr. Jones's contract claim because Mr. Jones failed to set forth affirmative evidence demonstrating a genuine issue of material fact as to this

---

[91] *See Coleman ex. rel Schefski v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122 (declining to review an issue where it was raised for the first time in the reply brief); *see also* UTAH R. APP. P. 24(c).

claim. We reverse the district court's decision to deny Mr. Jones's jury demand because an unjust enrichment claim for money damages was a claim at law at the time of the ratification of the Utah Constitution. To guide the district court on remand, we also clarify that the correct measure of damages for an unjust enrichment claim is the benefit conferred upon the defendant, but conclude that in this case, where the Defendant has requested the Plaintiff's professional services, this benefit is properly measured by the reasonable value of those services. In addition, we uphold the district court's dismissal of the individual defendants under both the unjust enrichment and the Fraudulent Transfers Act claims as Mr. Jones has failed to raise a genuine issue of material fact concerning these claims. Finally, we remand the case to the district court for further proceedings in accord with this decision.

———————