**P U B L I S H**

**UNITED STATES COURT OF APPEALS**

**Filed 4/30/96**

**TENTH CIRCUIT**

IN RE: PETERSON DISTRIBUTING, INC.,

Debtor,

CONOCO, INC., a Delaware corporation,

Appellee,

v.

HARRIET E. STYLER, as Trustee for
Peterson Distributing, Inc.,,

Appellant.

Case No. 95-4066

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
ROR THE DISTRICT OF UTAH
94-CV-697**

---

Brent A. Bohman (Frederick M. MacDonald with him on the briefs), Pruitt, Gushee & Bachtell, Salt Lake City, Utah for Plaintiff/Appellee Conoco, Inc.

Kevin R. Anderson (Harriet E. Styler with him on the briefs), Kruse, Landa & Maycock, Salt Lake City, Utah for the Defendant-Appellant.

---

**ANDERSON, KELLY**, and **HENRY**, Circuit Judges.

---

**HENRY**, Circuit Judge

In this adversary action, brought by Conoco, Inc. ("Conoco") against the bankruptcy trustee ("Trustee") for Peterson Distributing, Inc. ("Peterson"), Conoco seeks to recoup or setoff $69,370.49 worth of credit card invoices against its $245,159.06 claim in Peterson's bankruptcy estate. The trustee of Peterson's bankruptcy estate counterclaims for the turnover of the $69,370.49 in credit card invoices. The United States Bankruptcy Court for the District of Utah held that the doctrine of recoupment did not apply and that Conoco was only entitled to a setoff of those invoices submitted and credited to Peterson's account prior to the date Peterson filed its bankruptcy petition. Conoco appealed the bankruptcy court's decision to the United States District Court for the District of Utah, which reversed the decision of the bankruptcy court. The district court found that Conoco was entitled to recoup the entire $69,370.49 against its claim in Peterson's estate. Peterson now appeals from the decision of the district court. We reverse the decision of the district court.

## I. BACKGROUND

The parties have stipulated to the following facts:

The business relationship between Peterson and Conoco was governed by a Jobber Franchise Agreement, which incorporated the Conoco Credit Card Guide for Dealers (and its associated bulletins) and an Electronic Fund Transfer Agreement. Under the terms of the Jobber Franchise Agreement, Conoco agreed to sell products to Peterson on credit, who in turn sold those products to customers and other retail dealers. Conoco also agreed to accept credit card invoices from Peterson and to pay Peterson the face amount of the invoices less a three percent processing fee. If an invoice was acceptable under the terms of the Credit Card Guide, Conoco bore the risk of collection. The Credit Card Guide required, in part, that a credit card invoice be legible, signed by the consumer and not include charges for materials or services disputed by the

cardholder.  An invoice that failed to meet the requirements set forth in the Credit Card Guide was charged back to Peterson.  On or about May 8, 1987, Peterson joined Conoco's Preauthorized Electronic Fund Transfer Payment System.  The Electronic Fund Transfer Program provided that, on a bi-weekly basis, Conoco could automatically withdraw from Peterson's bank account the amount owing to Conoco for purchases.  The amount owing to Conoco for purchases was reduced automatically by the face amount of the credit card invoices (less the three percent collection fee) that were submitted to Conoco and not charged back to Peterson.

Peterson filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on June 28, 1991.  As of that date, Peterson owed Conoco $245,159.06 for purchases of Conoco products.  After the petition date, Peterson made six cash purchases of Conoco products.  Also, Peterson continued to accept credit cards as payment for retail sales and to assign credit card invoices to Conoco.  Peterson has submitted and Conoco has accepted credit card invoices totaling $69,370.49 that have not been credited against Peterson's account.  Of these invoices, $22,808.90 were submitted and accepted before the petition date.  The remainder, $46,561.59, was not available as a credit against Peterson's account until after the petition date.

## II.  DISCUSSION

We exercise jurisdiction pursuant to 28 U.S.C. § 158(d).  Our review of the bankruptcy court's decision is governed by the same standards of review that govern the district court's review of the bankruptcy court.  Taylor v. IRS, 69 F.3d 411, 415 (10th Cir. 1995).  Accordingly we review the bankruptcy court's legal determinations *de novo* and its factual findings under the clearly erroneous standard.  Robinson v. Tenantry (In re Robinson), 987 F.2d 665, 667 (10th Cir. 1993) (per curiam).  A finding of fact is clearly erroneous if it is without factual support in the

record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made.  Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985).

Peterson raises two claims on appeal:  (1) that the district court erred in reversing the bankruptcy court's judgment, which held that Conoco was not entitled to recoupment, and (2) that the bankruptcy court properly determined that Conoco's right of setoff under 11 U.S.C. § 553 was limited to $22,809.90, the total of the credit card invoices available as a credit against Peterson's account with Conoco before the bankruptcy filing.  We address each issue in turn.

## A.  Recoupment

### 1.  General Principles

Although modern counterclaim doctrine has replaced common law recoupment in most areas of the law, recoupment remains a distinct doctrine in bankruptcy cases, Davidovich v. Welton (In re Davidovich), 901 F.2d 1533, 1537 (10th Cir. 1990) (per curiam).  Originally an equitable rule of joinder for claims arising out of a single transaction, recoupment allowed adjudication in one suit of two claims that otherwise had to be brought separately under the common law forms of action.  Id.  Davidovich described recoupment as follows:

> In the modern bankruptcy setting, this rule [of recoupment] has evolved to permit a creditor to offset a claim that "'arises from the same transaction as the debtor's claim,'" without reliance on the setoff provisions and limitations of [11 U.S.C.] section 553, because the creditor's claim in this circumstance is "'essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable.'"

Id. (quoting Lee v. Schweiker, 739 F.2d 870, 875 (3rd Cir. 1984)).

The doctrine of recoupment may be better understood by way of comparison with the doctrine of setoff.  Setoff, codified in 11 U.S.C. § 553(a), gives a creditor the right "to offset a

mutual debt owing by such creditor to the debtor" provided that both debts arose before commencement of the bankruptcy action and are in fact mutual. See id. The creditor's mutual debt and claim generally arise from *different* transactions. 4 Collier on Bankruptcy § 553.03, at 553-14 (Lawrence P. King et al. eds., 15th ed. 1996). "Recoupment, on the other hand, is the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action . . . ." Id. at 553-15. Recoupment allows the defendant, in a suit between the estate and another, "to show that because of matters arising out of the transaction sued on, he or she is not liable in full for the plaintiff's claim." Id. at 553-17. Thus, recoupment is an equitable doctrine that allows the determination of a "just and proper liability" regarding such a claim. Id.

Recoupment is "narrowly construed" in bankruptcy cases because it violates the basic bankruptcy principle of equal distribution to creditors. See Ashland Petroleum Co. v. Welton (In re B & L Oil Co.), 782 F.2d 155, 158 (10th Cir. 1986) ("A fundamental tenet of bankruptcy law is that a petition for bankruptcy operates as a 'cleavage' in time. Once a petition is filed, debts that arose before the petition may not be satisfied through post-petition transactions . . . . Any recoupment exception to this general principle perhaps should be narrowly construed."). Therefore, for the purposes of recoupment, "same transaction" is a term of art that must be narrowly defined. See Davidovich, 901 F.2d at 1538 ("'The fact that the same two parties are involved . . . and that a similar subject matter gave rise to both claims . . . does not mean that the two arose from the "same transaction"' for purposes of the doctrine of recoupment." (quoting Lee, 739 F.2d at 875)); see also, University Medical Ctr. v. Sullivan (In re Univ. Medical Ctr.), 973 F.2d 1065, 1081 (3d Cir. 1992) (rejecting the "open-ended" definition of same transaction that is used in discerning compulsory counterclaims under Fed. R. Civ. P. 13(a) in favor of a narrowly construed definition of the term for equitable recoupment in bankruptcy). The Third

Circuit held in University Medical Center that for claims to arise from the "same transaction" for the purposes of recoupment "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." 973 F.2d at 1081.

Although not included in the Uniform Commercial Code or the Bankruptcy Code, recoupment functions like a security interest, in that it grants priority to a creditor's claim in the bankruptcy estate in so far as the estate has a claim against the creditor arising from the "same transaction" as the creditor's claim. The "same transaction" requirement acts as a mechanism to ensure that equitable reasons for recoupment are present before a creditor may attain priority through the doctrine of recoupment.

Conoco contends that as a rule courts have found claims involving the same contract to arise out of the "same transaction." See United States v. Midwest Serv. & Supply Co. (In re Midwest Serv. & Supply Co.), 44 B.R. 262, 266 (D. Utah 1983) (stating that "[a] single contract must be considered one transaction"); Security Pac. Nat'l Bank v. Enstar Petroleum Co. (In re Buttes Resources), 89 B.R. 613, 615-16 (S.D. Tex. 1988) (same); Mohawk Indus., Inc. v. United States (In re Mohawk Indus., Inc.), 82 B.R. 174, 176 (Bankr. D. Mass. 1987) (same); Waldschmidt v. CBS, Inc., 14 B.R. 309, 314 (M.D. Tenn. 1981) (same). However, we stated in B & L Oil that where there is a single contract it does not necessarily resolve the issue of whether there is a single transaction for the purposes of the recoupment doctrine. 782 F.2d at 158 (A single contract "does not resolve the question of whether the month-to-month purchases of oil arise out of the same transaction for purposes of applying the recoupment doctrine in a bankruptcy context."). See also University Medical Ctr., 973 F.2d at 1080 ("[T]he fact that a contract exists between the debtor and creditor [does not] automatically enable the creditor to

effect a recoupment."). But cf. Davidovich, 901 F.2d at 1538 ("[C]ourts have generally only found this 'same transaction' requirement to be satisfied when the debts to be offset arise out of a single, integrated contract or similar transaction."). A "same contract equals same transaction" rule would be overly simplistic. Instead, as our case law illustrates, the "same transaction" analysis involves an examination of the parties' equities. We held in Davidovich that recoupment "permit[s] a creditor to offset a claim that '"arises from the same transaction as the debtor's claim"' . . . because . . . '"application of the limitations on setoff in bankruptcy would be *inequitable*." 901 F.2d at 1537 (quoting In re B & L Oil, 782 F.2d at 157 (quoting Lee, 739 F.2d at 875)) (emphasis added). In B & L Oil, we analogized recoupment to unjust enrichment: "The situation before us is not one in which the creditor seeking relief consciously . . . extended credit . . . as did the bankrupt's ordinary creditors," but rather "allowing B & L's other creditors to share in this money [in controversy] would give them a windfall, a classic case of unjust enrichment." B & L Oil, 782 F.2d at 159. In light of recoupment's equitable foundation, the doctrine is only applicable to claims that are so closely intertwined that allowing the debtor to escape its obligation would be inequitable notwithstanding the Bankruptcy Code's tenet that all unsecured creditors share equally in the debtor's estate. University Medical Ctr., 973 F.2d at 1081. "Use of this stricter standard for delineating the bounds of a transaction in the context of recoupment is in accord with the principle that this doctrine, as a non-statutory, equitable exception to the automatic stay, should be narrowly construed." Id.

## 2. Tenth Circuit Decisions

In two prior decisions, we have discussed equitable recoupment in bankruptcy. In B & L Oil, a creditor made overpayments under a contract prior to the debtor's bankruptcy. After

bankruptcy, the creditor continued to buy oil from the debtor under the contract, but withheld from its payments the amount which it had previously overpaid the debtor. The creditor brought an adversary action in bankruptcy court seeking a declaration that it had properly recouped its overpayments and was entitled to recoup from future purchases the remaining amount it had overpaid. 782 F.2d at 156. We allowed recoupment because it would have been inequitable for the debtor to benefit from post-petition sales to the creditor under a contract without the burden of repaying pre-petition overpayments made by the creditor under the same contract. Id. at 159.

In Davidovich, the debtor, an attorney, sought to collect moneys owed to him by a former partner as the result of an arbitration which awarded the debtor an interest of 12.5% in the fees from a lawsuit. 901 F.2d at 1536. The debtor's former partner (the "creditor") defended by seeking to off set the debtor's claim for 12.5% of the fees against two claims of his own. We addressed the creditor's two claims under both the doctrines of recoupment and setoff. First, the creditor claimed $25,000 awarded to him by the arbitration. Second, the creditor claimed $52,000 that he paid into the partnership after the debtor failed to make a required partnership contribution. We allowed the creditor's claim to $25,000 to be setoff against the debtor's claim to 12.5% of the fees because both claims arose before bankruptcy and were mutual. Id. at 1537. We went on to say that recoupment was also available because the $25,000 claim and the 12.5% interest both arose "out of a single integrated transaction, the binding arbitration proceeding." Id. We allowed neither setoff nor recoupment of the creditor's $52,000 contribution to the partnership. Setoff was not appropriate because the creditor's $52,000 contribution to the partnership and the debtor's claim to 12.5% of the fees were not mutual; id. at 1538; moreover, the creditor made the contribution, like the case at bar, *after* the debtor filed bankruptcy. Id. at 1536. Recoupment was equally inappropriate because the creditor's claim to the $52,000

contribution arose under the partnership agreement, and the debtor's claim to 12.5% of certain fees arose under the arbitration. Id. at 1538.

### 3. Application

In this case, whether recoupment applies hinges upon whether Conoco's claim for $245,159.06 of purchases by Peterson and Peterson's claim for $69,370.49 in credit card invoice proceeds arose from the "same transaction."

The Jobber Franchise Agreement ("JFA") is a single integrated contract but one that incorporates the Conoco Credit Card Guide and an Electronic Fund Transfer Agreement, which govern several kinds of transactions. Pursuant to the JFA, Conoco willingly advanced its products to Peterson on credit. Peterson's account was paid monthly, at first by direct billing and later, when Peterson enrolled in the Electronic Fund Transfer Program, by Conoco's direct withdrawal from Peterson's bank account and automatic accounting for credit card invoices assigned to Conoco for collection. Nothing in the JFA prohibited Peterson from submitting credit card invoices arising from the purchases of non-Conoco products; nothing limited the amount of credit card invoices that might be submitted to the amount of Conoco products purchased. Peterson was obligated to accept the credit cards listed in the Conoco Credit Card Guide, and Conoco was obligated to accept credit card receipts that satisfied the standards set forth therein.

The nature of the JFA is of central importance to the outcome in this case. The JFA attempted to set forth the terms and conditions of the entire business relationship between Conoco and Peterson. It was not limited to a single sale of Conoco products but provided for several kinds of sales and related activities, such as the processing of credit card invoices. Thus,

the JFA governed many transactions that would take place between Conoco and Peterson over the course of their relationship.  Conoco's sales of products to Peterson certainly would appear to constitute separate transactions from Peterson's assignments and Conoco's processing of credit card receipts (for which Conoco also received a three percent service fee).  However, the JFA must be examined to determine whether these two activities -- the sale of products by Conoco and the submission of credit card invoices by Peterson -- were so closely intertwined that allowing Peterson to escape its obligation to pay Conoco for products purchased pre-petition with the proceeds from the invoices submitted and accepted post-petition would be inequitable notwithstanding the Bankruptcy Code's fundamental tenet that all unsecured creditors share equally in the debtor's estate.

Conoco argues that Peterson's assignment of credit card invoices was an in-kind payment for Conoco products and therefore both claims arose from the same transaction.  This argument is not persuasive.  The invoices (which arose from both Conoco product sales and other sales), like the automatic cash withdrawals from Peterson's bank account, were credited toward Peterson's *account* with Conoco.  The invoices and the cash withdrawals did not go directly toward the purchase of new Conoco products.  They paid off Peterson's previously incurred debt; had Peterson's debt been paid in full, Conoco would have had to pay Peterson for the surplus. The fact that Conoco required cash for Peterson's post-petition purchases of Conoco products further undermines Conoco's position.  If the credit card invoices were truly "in kind" payments for Conoco products then Conoco would have accepted credit card invoices as payment toward the post-petition purchases and not required that Peterson pay entirely with cash.

In support of its "in-kind" argument, Conoco cites B & L Oil: "[C]ourts have held that the debtor-in-possession or trustee may not accept the benefits of an executory contract without its

burdens." 782 F.2d at 159.  However, at the time Peterson's bankruptcy petition was filed, the

JFA was not executory.  Peterson was under no obligation to assign the proceeds from credit card

invoices to Conoco as a result of Conoco's cash sales of products to Peterson.

Conoco also argues that a condition of Conoco's acceptance of the credit card invoices

was that they be automatically credited toward Peterson's account; therefore, the submission of

the invoices and the crediting of Peterson's account constituted a single transaction.  This

contention is equally unpersuasive.  It is true that under the Electronic Funds Transfer Program,

which was incorporated into the JFA, credit card invoices submitted to Conoco by Peterson were

automatically credited to Peterson's account.  However, it was not a condition of Peterson's

joining the program that the credit card invoices be automatically credited.  The program states:

> By utilizing the preauthorized payment system, you will receive the following benefits:
> . . .
> **Branded Jobbers Get Immediate Use of Credit Card Receipts**
> By deducting all credit card transmittals received on the next payment processed, you receive immediate use of credit card funds.  You will not have to wait for a reimbursement check to be processed and returned.  *However, if you wish to continue on the present credit card reimbursement system, you may do so.*

Aplt's App. at 66 (emphasis added).  The automatic crediting of credit card invoices was a

benefit bestowed upon Peterson that was meant to entice Peterson into entering the Electronic

Funds Transfer program.  The language of the program evinces the parties' intent to facilitate

their relationship, not to alter the underlying rights to certain funds.

Further, no overriding equitable reason exists that compels the application of the doctrine

of recoupment in this case.  As in B & L Oil, this case may be analogized to unjust enrichment;

only here, it is Conoco that would be unjustly enriched as to other creditors through recoupment,

not the debtor's estate through strict adherence to the automatic stay.  See 782 F.2d at 159.  If

Conoco is allowed to recoup the credit card invoices against its claim in the debtor's estate,

Conoco would effectively be given a security interest in the credit card invoices that was unknown to and undiscoverable by other unsecured creditors doing business with Peterson. If Conoco desired to stand in front of other creditors with respect to the credit card invoices and their proceeds, it easily could have perfected a security interest in the invoices and their proceeds under the Uniform Commercial Code. Allowing Conoco to improve its standing relative to other unsecured creditors through the doctrine of recoupment, when Conoco was perfectly aware of its credit exposure to Peterson, would give Conoco a windfall and unjustly enrich the company at the expense of the other unsecured creditors. See id. (In allowing recoupment in B & L Oil, we noted that "[t]he situation . . . is not one in which the creditor seeking relief consciously . . . extended credit."). We see no reason why Conoco deserves to be treated more favorably than other unsecured creditors in this case.

For the foregoing reasons, Peterson's assignments of the credit card invoices cannot be viewed as part of the same transaction as Conoco's sale of products to Peterson, notwithstanding the fact that a single integrated contract governed the rights of both parties with regard to both transactions. Because Peterson's assignments of the credit card invoices were not part of the same transaction as Conoco's sale of products, the doctrine of recoupment does not apply. Peterson's bankruptcy estate is entitled to the turnover of the $69,370.49 in credit card invoices pursuant to the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362(a), subject to Conoco's right to setoff under 11 U.S.C. § 553.

## B. Setoff

Under 11 U.S.C. § 553, a creditor may setoff "'a mutual debt owing by such creditor to the debtor' so long as both debts arose before commencement of the bankruptcy action and are

indeed mutual." Davidovich, 901 F.2d at 1537 (quoting 11 U.S.C. § 553(a)).

The setoff issue presented by this case is whether Peterson's claim against Conoco arose on the date the credit card invoices were incurred (i.e., the date the customer signed the credit card invoice), or on the date the credit card invoices were first available as a credit against Peterson's account with Conoco (i.e., the date Conoco accepted the submitted invoices as credit against Peterson's account). Using the date the credit card invoices were incurred, Conoco would be entitled to a setoff of $48,678.26. Using the date the invoices were first available as credit against Peterson's account, Conoco would be entitled to a setoff of $22,808.90.

Because the district court found that recoupment of the entire $69,370.49 in credit card invoices was proper, it did not reach the issue of setoff under 11 U.S.C. § 553. For this reason, Conoco argued that the issue of setoff is not properly before this court and that if we reverse the district court's recoupment decision, we should remand the issue of setoff to the district court. In reliance on this position, Conoco did not brief the merits of the setoff issue. However, this court has jurisdiction over the setoff issue pursuant to 28 U.S.C. § 158(d). In this case, the district court reviewed the bankruptcy court's judgment, which allowed setoff under 11 U.S.C. § 553 based upon the stipulated facts of the parties. Both the bankruptcy court's judgment and the stipulated facts are in the record submitted for review by this court. Aplt's App. at 148, 187, 198. See Fed. R. App. P. 6(b)(2)(ii). Nothing is to be gained by remanding the setoff issue back to the district court except judicial inefficiency and greater expense by the parties. This court reviews the order of the bankruptcy court under the same standards used by the district court. C.I.T. Fin. Servs., Inc. v. Posta (In re Posta), 866 F.2d 364, 366 (10th Cir. 1989) (per curiam); Davidovich, 901 F.2d at 1536.

After denying Conoco's claim for recoupment, the bankruptcy court decided that Conoco

was only entitled to a setoff of $22,808.90 against its claim against Peterson's estate under 11 U.S.C. § 553.  The court reasoned that Conoco only became liable for the invoices after Peterson submitted them and Conoco accepted them pursuant to the Credit Card Guide.  The Trustee's brief echos the analysis of the bankruptcy court.

In Davidovich, this court held that setoff requires that "each debt be valid and enforceable."  901 F.2d at 1537.  Peterson's claim against Conoco was not "valid or enforceable" until Conoco accepted the submitted credit card invoices as credit against Peterson's account pursuant to the requirements set forth in the Credit Card Guide.  The Credit Card Guide requires, among other things, that the invoices be signed, that consumers not dispute the invoices and that the invoices be legible before they are credited against Peterson's account.  Moreover, it was only after the invoices were submitted and accepted that they were "automatically" credited to Peterson's account.

Therefore, the bankruptcy court was correct in limiting Conoco's right of setoff to $22,808.90, those invoices submitted to and accepted by Conoco.


## III.  CONCLUSION

The judgment of the United States District Court for the District of Utah is REVERSED. We REMAND this proceeding to the district court for further proceedings in accordance with this decision.