FILED
United States Court of Appeals
Tenth Circuit

December 18, 2023

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

In re:  BLACK IRON,

    Debtor.

------------------------------

UTAH IRON; GILBERT
DEVELOPMENT CORPORATION,

    Appellants,

v.

WELLS FARGO RAIL, f/k/a First Union
Rail Corporation; HELM-PACIFIC
LEASING,

    Appellees.

No. 21-4116
(D.C. No. 2:18-CV-00962-BSJ)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BALDOCK**, and **EBEL**, Circuit Judges.[†]
_____

In this adversary proceeding governed by Utah law, the bankruptcy court held

Appellants fraudulently transferred an iron ore mine and converted Appellees' rail

equipment used at the mine.  Having jurisdiction under 28 U.S.C. § 1291, we

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[†] The Honorable Joel M. Carson has recused from this case, and the Honorable
Robert E. Bacharach has taken his place on the panel.

AFFIRM all but the bankruptcy court's damages award for conversion.  On that issue, we VACATE the award and REMAND for reconsideration.

I.

Eighteen years ago [in 2005], CML Metals, Inc.'s ("CML") predecessor in interest purchased an iron mine in Utah.  [Appellants' App. vol. 1 at 26.]  A holding company (CML Holdings, Inc.) solely owned CML.  [Id.]  One of the appellants, Gilbert Development Corporation ("GDC") owned shares in CML Holdings and served as operator of the mine.  [Id. at 27, 196–97, 199.]  Another CML entity—CML Railroad, Inc.—operated tracks between the mine and Union Pacific's railroad tracks.  [Id. at 27.]

From 2010 to 2014, CML leased 540 railcars and four locomotives ("the Equipment") from Wells Fargo's predecessor to haul iron ore.‡  For various reasons including the price of iron ore dropping by almost half, CML suspended its mining operations in October 2014.  [Id. at 30.]  At the same time, CML fell behind on payments to Wells Fargo.  [Id.]

---

‡ Four leases signed by either CML or CML Railroad, on the one hand, and Helm-Pacific or Helm Financial, on the other hand, memorialized the number of railcars, daily rental rate, and term.  [See Appellants' App. vol. 1 at 29–30.]  Helm Financial merged with First Union Rail Corporation in August 2015.  [Id. at 28.]  First Union changed its name to Wells Fargo Rail Corporation in February 2016.  [Id.]  Throughout this opinion, we will refer to Helm Financial/First Union/Wells Fargo as Wells Fargo unless distinguishing is helpful or legally significant.  That form of reference is consistent with the parties' briefing and prior court opinions.

2

Wells Fargo declared a default. [Id.] In response, CML asked Wells Fargo to forbear from exercising its available remedies to allow CML an opportunity to be sold as a going concern. [Id. at 30–31.] Agreeing that a sale may best serve the interests of the parties, Wells Fargo did not immediately pursue its default remedies and instead began negotiating a forbearance agreement with CML. [Id. at 31.]

The forbearance negotiations between Wells Fargo and CML went on for months and, during this time, CML's focus shifted from selling the business to selling its assets to GDC. [See id. at 32–34.] CML's chairman of the board, Michael Conboy, and a principal of GDC, Steve Gilbert, led the asset purchase negotiations.§ [Id. at 34.] Conboy and Gilbert negotiated by phone; Gilbert recorded many of their conversations. [Id.] During one of their conversations, Conboy explained his view of the transaction:

> It's an – it's an asset purchase so it would just be all the – all the assets of the mine. So we're not selling the stock because we've got to – no one else wants to – no one else wants to step into our potential liability with First Union [Wells Fargo, see supra note 1] or a potential liability with Trafigura. So just buy the mine. It's just the assets, an asset purchase. Everything else, my problem.

Appellants' App. vol. 1 at 34.

During another conversation, Conboy and Gilbert discussed whether to transfer the assets to GDC or a separate corporate entity. [Id. at 35.] Ultimately, the parties inserted a provision into their Asset Purchase Agreement ("APA") that "CML

---

§ Besides being a principal of GDC, Steve Gilbert was also the father of CML's president, Dale Gilbert. Because of the relationship between Steve and Dale, CML excluded Dale from these negotiations. [Appellants' Br. at 7.]

3

will convey the assets to GDC or, at GDC's direction, GDC's nominee." [Id.] On April 2, 2015, CML and GDC signed the APA. [Id.] On April 14, Gilbert formed Black Iron, a Utah limited liability company. [Id. at 35, 56.] On April 29, GDC, by contract, assigned its rights under the APA to Black Iron. [Id. at 35.] The transaction closed on May 5, 2015. [Id.] At closing, the title company disbursed payments to various creditors, but Wells Fargo received nothing and the Equipment remained at the mine. [Id. at 36.] Like the courts before us, we refer to this sequence of events as the "Transfer."

Wells Fargo knew nothing of the negotiations between Conboy and Gilbert, yet it knew CML was stalling. Indeed, in March 2015, Wells Fargo grew impatient and demanded that CML execute the forbearance agreement. [Id. at 32.] Rather than sign, CML filed a complaint against Wells Fargo in state court for breach of contract and breach of the implied covenant of good faith and fair dealing. [Id.; Appellants' Br. Ex. 4 at 4.] On May 5, 2015—the same day the Transfer closed—Wells Fargo counterclaimed against CML and demanded return of the Equipment. [Appellants' App. vol. 1 at 32.]

On May 8, Black Iron asked Wells Fargo to remove the Equipment by June 1, 2015, or else it would charge storage fees. [Id. at 114, 230.] Wells Fargo agreed to remove the Equipment. But to effectuate removal, both the Equipment and certain tracks needed repair. [Id. at 114–15.] From May through August 2015, Wells Fargo coordinated with repair teams, inspectors, and other personnel. [Id. at 114.] At the same time, Wells Fargo also communicated with Black Iron about the repair and

4

removal efforts, which were scheduled to begin in earnest the week of August 24, 2015.  [Id. at 114–15.]

Amid the Equipment repair and removal conversations, on August 19, 2015, Wells Fargo filed suit against Black Iron and GDC, alleging the Transfer was a fraudulent conveyance.  [Id. at 142.]  The next day, Black Iron sent Wells Fargo an email instructing it to "cease and desist" its plan to remove the Equipment.  [Id. at 114.]  The email stated: "Please be advised due to legal issue [sic] pertaining to storage and security of the rail cars sitting on the Black Iron, LLC property these car [sic] cannot be moved until these issues are resolved."  [Id. at 114.]  The cease-and-desist command prevented Wells Fargo's repair vendor from starting work as originally scheduled.  [Id. at 115.]

Still, over the next year [from September 2015 through August 2016], the parties did attempt to re-engage in removal efforts.  For example, on September 17, 2015, a representative from Wells Fargo emailed Black Iron to confirm a phone conversation in which Black Iron gave Wells Fargo permission to enter the property and remove the Equipment.  [Appellants' App. vol. 1 at 64.]  But, as subsequent emails between Wells Fargo and Union Pacific personnel reiterate, the Equipment and tracks still needed repair and inspection work before Wells Fargo could effectuate removal.  [Appellants' App. vol. 13 at 163–66, 172; vol. 15 at 112–16.]  Discussions continued and, on March 15, 2016, an attorney for Black Iron authorized Wells Fargo to enter the property to repair and extract the Equipment.  [Appellants' App. vol. 1 at 115.]

5

But weeks later, on April 4, 2016, Black Iron demanded $2.5 million in storage costs for the Equipment. [Id. at 115, 122.] Three months later, on July 12, 2016, Black Iron again demanded storage costs, this time totaling $16 million. [Id. at 115, 122.] The parties' repair and removal communications carried on despite these demands. Finally, in July 2016, a repair crew came to Utah with the vehicles and equipment to repair and extract the Equipment. [Id. at 115–16.] Yet, on August 22, 2016, Black Iron informed Wells Fargo that it would not be allowed to remove the Equipment unless it paid $23 million in storage costs. [Id. at 116.] That demand was the final straw for the parties: Wells Fargo refused to pay storage costs and Black Iron refused to allow property access. [Id.]

Almost a year later, in June 2017, Black Iron filed for Chapter 11 relief. [Appellants' Br. at 14.] In 2018, Wells Fargo asked the bankruptcy court for permission to enter the property and remove the Equipment. [Appellants' Br. Ex. 4 at 7.] The bankruptcy court authorized Wells Fargo to remove the Equipment and required it to post a bond of $10 million. [Id.] In July 2018, Wells Fargo sold the Equipment in place (as-is, where-is) to a scrap company for $3,614,416. [Id.; Appellants' App. vol. 1 at 67; vol. 15 at 93–96.]

The bankruptcy court issued three decisions relevant on appeal. In the first, it granted Wells Fargo summary judgment on Black Iron's claims for storage fees and trespass ("Storage Fees and Trespass Order"). [Appellants' App. vol. 1 at 85 (first page).] In the second, it granted Wells Fargo summary judgment on its conversion claim against Black Iron ("Conversion Order"). [Id. at 110 (first page).] And in the

6

third, after a trial, it issued a memorandum decision and order finding Black Iron and GDC liable for fraudulent transfer ("Decision After Trial") under Utah's Uniform Fraudulent Transfer Act ("UFTA").** [Id. at 21 (first page).] In its judgment accompanying the Decision After Trial, it awarded Wells Fargo $2,618,680.44 in damages against Black Iron and GDC under UFTA. [Id. at 78, 83 ($2,618,680.44 is the combination of the first two line items).] It also awarded Wells Fargo $7,885,584 in damages against Black Iron for conversion. [Id. at 80, 83.]

Black Iron, CML, and GDC appealed the bankruptcy court's decisions to the district court. Upon its own review, the district court affirmed each of the bankruptcy court's decisions. Utah Iron v. Wells Fargo Rail, 634 B.R. 122, 129 (D. Utah 2021). Black Iron now appeals the district court's decision, raising several issues.†† First, Black Iron challenges the bankruptcy court's Storage Fees and Trespass Order, arguing that the bankruptcy court improperly granted summary judgment on its theories of breach of contract implied in fact, breach of contract implied in law, warehouse lien, and trespass. Black Iron next challenges the

---

** In 2017, Utah replaced UFTA with the Utah Voidable Transactions Act. But because the Transfer occurred in 2015, UFTA governs. See Georgelas v. Desert Hill Ventures, Inc., 45 F.4th 1193, 1195 n.2 (10th Cir. 2022).

†† CML is not a party to this appeal—only Black Iron and GDC remain. [See Doc. 10868131.] We also note that, during bankruptcy, Black Iron changed its name to Utah Iron, LLC. That is, Utah Iron, LLC is the successor in interest to Black Iron, LLC (and thus is the named party in this appeal). Like the parties, we use the name "Black Iron" because that was the relevant name throughout the history of this case. Also like the parties, we tend to refer to Black Iron and GDC together as "Black Iron" for argument-presentation and analysis purposes unless clarity demands specificity.

bankruptcy court's Conversion Order, arguing error in its determinations that no reasonable factfinder could have concluded Black Iron was justified in possessing the Equipment and that Black Iron deprived Wells Fargo of use of the Equipment. Then, Black Iron contends that, even if it were liable for conversion, the bankruptcy court wrongly decided the conversion date. And finally, Black Iron challenges the Decision After Trial because, by its estimation, it did not make the Transfer with intent to hinder or delay Wells Fargo, it was not to an insider, and it was for more than an antecedent debt.

We address each in turn.

## II.

In an appeal from a district court's review of a bankruptcy court order, "we independently review the bankruptcy court's decision, applying the same standard as the . . . district court." In re C.W. Mining Co., 798 F.3d 983, 986 (10th Cir. 2015) (quoting In re Millennium Multiple Employer Welfare Benefits Plan, 772 F.3d 634, 638 (10th Cir. 2014)). We review bankruptcy court orders granting summary judgment in adversarial proceedings de novo, id., and affirm if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); see Fed. R. Bankr. P. 7056 (applying Rule 56 to adversary proceedings).

We also review "factual findings under the clearly erroneous standard." In re Miniscribe Corp., 309 F.3d 1234, 1240 (10th Cir. 2002) (quoting In re Peterson Distrib., Inc., 82 F.3d 956, 959 (10th Cir. 1996)). "A finding of fact is clearly

8

erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." Id.

### III.

### A.

Black Iron first contends that the bankruptcy court should not have granted summary judgment against it on its claim for storage fees. In the bankruptcy court, Black Iron presented four legal paths to storage fees—each of which the bankruptcy court rejected. On appeal, Black Iron challenges three of the bankruptcy court's determinations: no contract implied in law, no contract implied in fact, and no warehouse lien.

### 1.

We start with the bankruptcy court's rejection of Black Iron's theory of a breach of contract implied in fact. Under Utah law, a contract implied in fact requires: "(1) the defendant requested the plaintiff to perform work; (2) the plaintiff expected the defendant to compensate him or her for those services; and (3) the defendant knew or should have known that the plaintiff expected compensation." Davies v. Olson, 746 P.2d 264, 269 (Utah Ct. App. 1987). A contract implied in fact is a contract "established by conduct" and "require[s] a meeting of the minds." Jones v. Mackey Price Thompson & Ostler, 355 P.3d 1000, 1012 (Utah 2015). But the parties need not agree on a contract price to support a claim. Davies, 746 P.2d at 269.

As a threshold issue, Black Iron says that the bankruptcy court did not correctly recite the correct elements of a claim for breach of contract implied in fact. On this point, we agree with Black Iron; the bankruptcy court's order recited the elements of a claim for breach of contract implied in law. But we disagree that the bankruptcy court's failure to state the correct elements demands reversal because the court's analysis was ultimately correct.

According to Black Iron, reversal is mandatory because a bankruptcy court "abuses its discretion when it . . . commits an error of law, such as applying an incorrect legal standard or misapplying the correct legal standard." In re Stewart, 970 F.3d 1255, 1263 (10th Cir. 2020) (quoting Farmer v. Banco Popular of N. Am., 791 F.3d 1246, 1256 (10th Cir. 2015)). We recognize that the bankruptcy court set forth an incorrect legal standard. But abuse of discretion turns on application—not presentation. See id. And, despite the bankruptcy court's misstatement of the legal standard, the court ultimately applied the correct standard. Indeed, the bankruptcy court's determination turned on whether evidence existed to support a meeting of the minds. [Appellants' App. vol. 1 at 95–96.] Meeting of the minds is a requirement of a contract implied in fact—not one implied in law. Jones, 355 P.3d at 1012. The bankruptcy court applied the correct standard and committed no reversible error.

In its briefing, Black Iron acknowledges that contracts implied in fact require a meeting of the minds. [Appellants' Br. at 19.] Yet, in its opening brief, Black Iron does not argue the bankruptcy court erred in finding no meeting of the minds. Then, in its reply brief, Black Iron says Gilbert's testimony creates a factual dispute on

whether Wells Fargo agreed to pay fees if it did not remove the Equipment. [Appellants' Reply Br. at 2–3.] But "we generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived." United States v. Leffler, 942 F.3d 1192, 1197 (10th Cir. 2019) (citing United States v. Pickel, 863 F.3d 1240, 1259 (10th Cir. 2017)). So Black Iron waived any argument that there was a meeting of the minds. The lack of meeting of the minds is fatal to Black Iron's theory of a contract implied in fact.

2.

The bankruptcy court also determined that no contract implied in law existed between Black Iron and Wells Fargo. A contract implied in law requires: "(1) [t]he defendant received a benefit; (2) an appreciation or knowledge by the defendant of the benefit; (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it." [‡‡] Emergency Physicians Integrated Care v. Salt Lake Cnty., 167 P.3d 1080, 1083 (Utah 2007) (quoting Davies, 746 P.2d at 269). The bankruptcy court granted summary judgment on this theory, reasoning that Wells Fargo received no benefit from Black Iron. Black Iron argues that the bankruptcy court disregarded the storage service benefits provided to Wells Fargo and focused on the wrong issues. Wells Fargo disputes the existence of a benefit from Black Iron's conduct. [Appellees' Resp. Br. at 33–35.]

---

[‡‡] The parties call this theory contract implied in law, so we do too. But we note that, under Utah law, contract implied in law is the same as quasi-contract or unjust enrichment. Davies, 746 P.2d at 269 ("Contract implied in law, also known as quasi-contract or unjust enrichment, is one branch of *quantum meruit*.").

11

We need not resolve this dispute because Wells Fargo also presents an alternative ground to affirm based on the third element (whether it would be unjust for the defendant to retain the alleged benefit without paying for it). "We have discretion to affirm on any ground adequately supported by the record." Elkins v. Comfort, 392 F.3d 1159, 1162 (10th Cir. 2004) (citing Stillman v. Teachers Ins. & Annuity Ass'n Coll. Ret. Equities Fund, 343 F.3d 1311, 1321 (10th Cir. 2003)). In deciding whether to exercise this discretion, we consider

- whether the ground was fully briefed here and in district court,

- whether the parties have had an opportunity to develop the record, and

- whether our decision would involve only questions of law.

Id.

These factors support consideration of Wells Fargo's argument on the third element. Wells Fargo briefed the equitable considerations here and in bankruptcy court, [Appellees' Resp. Br. at 35; Appellants' App. vol. 1 at 156–57.], the parties had an opportunity to develop the record through their summary-judgment briefing, and application of the summary-judgment standard involves a question of law. See Stewart v. City of Okla. City, 47 F.4th 1125, 1133 n.5 (10th Cir. 2022) (recognizing "our decision as to whether a genuine and material dispute exists is a legal judgment based on undisputed facts"). So we can consider Wells Fargo's argument to affirm based on the third element.

In Utah, "[u]njust enrichment does not apply to every circumstance where one has been benefitted by another's detriment." Gen. Leasing Co. v. Manivest Corp.,

12

667 P.2d 596, 597 (Utah 1983). When the benefit is conferred on the defendant without its request or permission, Utah courts generally deny recovery for unjust enrichment. Id. at 598. So if the defendant had no choice, the balance of equities weighs against the plaintiff. See Howard v. Maness, 309 P.3d 279, 289–90 (Utah App. 2013).

Wells Fargo argues that it had no choice but to leave the train equipment where it was. Black Iron responds that it blocked access based on "legitimate concerns as to whether Wells Fargo owned the vehicles, and it was seeking to verify that Wells Fargo had the right to remove them." [Appellants' Reply Br. at 6.] In making that argument, Black Iron admits that

- it blocked access to the equipment and

- Wells Fargo had no choice but to leave Equipment on Black Iron's land.

Given these admissions, any factfinder would be compelled to reject the claim at the third element because Wells Fargo had no choice but to leave the Equipment on Black Iron's land. We thus affirm the grant of summary judgment on this claim.

3.

The bankruptcy court determined Black Iron's "warehousing" claim failed too. Under Utah law, a "warehouse" may have a lien against a bailor "on the goods covered by a warehouse receipt or storage agreement." Utah Code Ann. § 70A-7a-209(1) (2023). The statute defines a "warehouse" as "a person engaged in the business of storing goods for hire." Utah Code Ann. § 70A-7a-102(1)(m) (2023). But "[a] warehouse receipt need not be in any particular form." Utah Code Ann. §

13

70A-7a-202(1) (2023). And "the question of whether or not someone is a warehouseman depends upon whether he has accepted 'the responsibility of safekeeping the property of others entrusted to him.'" Enerco, Inc. v. SOS Staffing Servs., Inc., 52 P.3d 1272, 1275 (Utah 2002) (quoting Barlow Upholstery & Furniture Co. v. Emmel, 533 P.2d 900, 901 (Utah 1975)).

The bankruptcy court concluded that Black Iron did not satisfy the warehouse lien statute requirements because Black Iron was not a warehouse and no warehouse receipt or storage agreement existed. We need only address the latter.

On the existence of a warehouse receipt or storage agreement, Black Iron says invoices it sent to Wells Fargo for storage fees created a disputed issue as to whether these invoices constituted warehouse receipts. [Appellants' Br. at 31.] Black Iron did not make this argument to the bankruptcy court and does not argue plain error. Wells Fargo pointed out Black Iron's failure to preserve this argument in its response brief. [Appellees' Resp. Br. at 28.] In reply, Black Iron suggests that it was enough to submit the invoices with its summary judgment papers. We disagree. Without an argument by Black Iron, the invoices alone wouldn't have alerted the bankruptcy court to an issue involving the existence of a warehouse receipt or storage agreement. See In re Rumsey Land Co., LLC, 944 F.3d 1259, 1271–72 (10th Cir. 2019) (explaining forfeiture, waiver, and steps necessary for issue preservation).

Thus, the bankruptcy court did not err in its determination that Black Iron was not entitled to a warehouse lien against Wells Fargo.

B.

Black Iron next contends that the bankruptcy court should not have granted summary judgment against it on its trespass claim. Utah courts apply the definition of trespass from the Restatement (Second) of Torts. See Walker Drug Co., Inc. v. La Sal Oil Co., 972 P.2d 1238, 1243 (Utah 1998); see also Carter v. Done, 276 P.3d 1127, 1132 (Utah Ct. App. 2012). The Restatement provides:

> One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally
>
> > (a) enters land in the possession of the other, or causes a thing or a third person to do so, or
> >
> > (b) remains on the land, or
> >
> > (c) fails to remove from the land a thing which he is under a duty to remove.

Restatement (Second) of Torts § 158 (Am. L. Inst. 1965).

Plus, a trespass can occur if a property owner withdraws permission for a thing to be on the property, yet it remains. Id. § 160. But trespass does not necessarily begin upon revocation of consent. The Restatement expects that a party would enter the land to remove the thing "in a reasonable manner and with reasonable promptness." Id. § 177. Employing that standard, the bankruptcy court found that Wells Fargo did not trespass because it was taking reasonable steps to extract the Equipment and Black Iron imposed an unreasonable time constraint. Black Iron presents no reason to disturb that ruling on appeal.

15

Black Iron has waived any argument that Wells Fargo didn't remove the material in a reasonable manner. The bankruptcy court held that Wells Fargo's efforts had been reasonable as a matter of law. [Appellants' App. vol. 1 at 104.] On appeal, Black Iron argues that Wells Fargo's efforts were not reasonable because it refused to move the Equipment until it was in "like-new" condition. [Appellants' Br. at 35.] But, as Wells Fargo points out, Black Iron failed to make this argument in the bankruptcy court. [Appellees' Resp. Br. at 40.] Black Iron points to evidence it submitted to the bankruptcy court that allegedly supports its position, but it doesn't point out where it made an *argument* sufficient to preserve its position. [Appellants' Reply Br. at 9.] Black Iron waived the argument by failing to make it in bankruptcy court.

Because Black Iron failed to demonstrate a genuine dispute of fact on the reasonableness of Wells Fargo's removal efforts, Wells Fargo was entitled to summary judgment on the trespass claim.

C.

Turning to Wells Fargo's claims, Black Iron argues the bankruptcy court erred in three ways as to Wells Fargo's conversion claim. First, Black Iron says it raised genuine issues of material fact on two of the conversion elements. Second, Black Iron says a genuine dispute of fact exists on the conversion date. And finally, Black Iron says the bankruptcy court wrongly calculated conversion damages.

1.

Conversion occurs in Utah when: "(i) there is willful interference with personal property; (ii) without lawful justification; (iii) by which the person entitled to the property is deprived of its use or possession; and (iv) the party alleging conversion was entitled to immediate possession of the property at the time of conversion." Nilson v. JPMorgan Chase Bank, N.A., 690 F. Supp. 2d 1231, 1252 (D. Utah 2009) (citing Bennett v. Huish, 155 P.3d 917, 928 (Utah App. 2007); Jones v. Salt Lake City Corp., 78 P.3d 988, 992 (Utah App. 2003)). "[W]hile intentional conduct is required, conscious wrongdoing is not. As a result, the intent to exercise dominion is enough to satisfy a conversion claim." Id.

Black Iron challenges the second and third elements of conversion, arguing that a reasonable factfinder could have concluded Black Iron was justified in possessing the Equipment and that the bankruptcy court misapplied the law on deprivation of use.

As a threshold issue on justification, Black Iron claims the bankruptcy court improperly placed the burden of proof on Black Iron instead of Wells Fargo. We disagree. Contrary to Black Iron's suggestion, the bankruptcy court analyzed justification as an element of conversion, not an affirmative defense. The bankruptcy court did cross-apply analysis from its storage fees and trespass analysis, but that is because the same facts that allowed it to grant summary judgment against Black Iron on those claims allowed it to find Black Iron had no lawful justification for interfering.

17

According to Black Iron, fact issues exist on justification because Black Iron had possessory rights as a warehouseman, trespassee, and involuntary bailee. [Appellants' Br. at 38.]  We disagree.  As explained in the above sections, Black Iron did not have possessory rights as a warehouseman or trespassee.  And Black Iron didn't make the involuntary bailee argument to the bankruptcy court.  [Appellants' App. vol. 4 at 54–58.]  Wells Fargo pointed out Black Iron's failure to preserve this argument.  [Appellees' Resp. Br. at 29 n.9.]  In its reply, Black Iron did not dispute that it had waived this argument or otherwise indicate how it had preserved this argument.  [Appellants' Reply Br. at 10.]  So Black Iron waived any non-obvious argument on preservation of this argument.  See Hasan v. AIG Prop. Cas. Co., 935 F.3d 1092, 1099 (10th Cir. 2019); Eaton v. Pacheco, 931 F.3d 1009, 1031 (10th Cir. 2019).

Turning to deprivation of use, the bankruptcy court found that the cease-and-desist email "had the effect of depriving" Wells Fargo of the use and possession of the Equipment.  [Appellants' App. vol. 1 at 127.]  Similarly, the bankruptcy court found that the August 2016 demand for payment sufficiently interfered with Wells Fargo's right to use and possess its chattel.  [Id. at 128.]  Black Iron argues that the cease-and-desist email and August 2016 demand did not cause Wells Fargo to be deprived of its use or possession of the Equipment.  [Appellants' Br. at 40–41.]  Rather, Black Iron posits that Wells Fargo could not have used the Equipment until it made repairs and took other steps necessary for removal.  Stated simply, Black Iron says its acts did not cause the harm.

But Black Iron failed to make this argument in bankruptcy court, and Wells Fargo noted this failure in its response brief.[§§] [Appellees' Resp. Br. at 14.]

The bankruptcy court thus did not err in finding Black Iron liable for conversion of the Equipment.

2.

In its Conversion Order the bankruptcy court determined the conversion date was the date of the "cease-and-desist" email (August 20, 2015). Black Iron argues the bankruptcy court should not have determined the conversion date on summary judgment because that improperly precluded Black Iron from presenting evidence of an alternative conversion date at trial.

There is no dispute that, on August 20, 2015, Black Iron sent Wells Fargo an email instructing it to "cease and desist" its plan to remove the Equipment. [Appellants' App. vol. 1 at 241.] The email stated: "Please be advised due to legal issue [sic] pertaining to storage and security of the rail cars sitting on the Black Iron, LLC property these car [sic] cannot be moved until these issues are resolved." [Id. at 114.] There is also no dispute that Wells Fargo was entitled to possession of the Equipment, yet this command prevented Wells Fargo's repair vendor from starting work as originally scheduled. [Id. at 115.] So, taken together, there is no genuine issue of material fact that, on August 20, 2015, Black Iron converted the

---

[§§] To its credit, Black Iron admitted in its reply brief that (1) the deprivation prong had been "largely uncontested" and (2) the "main dispute center[ed] on the [justification] element." [Appellants' Reply Br. at 10.]

Equipment—it willfully interfered with Wells Fargo's personal property, without lawful justification, which deprived Wells Fargo of use or possession, despite Wells Fargo's being entitled to immediate possession at that time.  See Nilson, 690 F. Supp. 2d at 1252 (citing Bennett, 155 P.3d at 928; Jones, 78 P.3d at 992).  Thus, the bankruptcy court properly decided this issue on summary judgment.

3.

"[T]he measure of damages for conversion when property is not returned is the value of the property at the time of the conversion, plus interest."  Madsen v. Madsen, 269 P. 132, 134 (Utah 1928) (citing Whittler v. Sharp, 135 P. 112, 114–15 (Utah 1913); Larsen v. Ryan, 180 P. 178, 180 (Utah 1919)).  "The primary objective in rendering an award of damages for conversion is to award the injured party full compensation for actual losses."  Henderson v. For-Shor Co., 757 P.2d 465, 469 (Utah Ct. App. 1988).  We review the bankruptcy court's damages award for clear error.  In re Miniscribe Corp., 309 F.3d 1234, 1240 (10th Cir. 2002).  But we review de novo the methodology used in calculating the damage award, "such as determining the proper elements of the award or the proper scope of recovery."  S. Colo. MRI, Ltd. v. Med-Alliance, Inc., 166 F.3d 1094, 1100 (10th Cir. 1999).

A review of the relevant legal standard highlights that property value is the measure of damages for conversion "when property is not returned."  Madsen, 269 P. at 134.  Over a century ago, the Utah Supreme Court explained:

> Now ordinarily in conversion, when the property is not returned, the measure of damages is the value of the property at the time of the conversion. But that is not so when the property has been returned and

20

received by the plaintiff. In such case, the return to, and acceptance of the property by, the plaintiff, though not a bar to the action, nevertheless goes in mitigation of damages, for the plaintiff cannot have the full value of the property converted and at the same time have the property itself. The authorities very generally hold that in an action for conversion a return of the property to the plaintiff, and an acceptance of it by him, may be shown in mitigation of damages, if the property when returned was in the same condition as when taken, and if the plaintiff suffered no special damages.

Whittler, 135 P. at 115.

In this case, Black Iron returned the property.  So the proper measure of damages would be the value of the Equipment at the date of conversion less the value of the Equipment when it was returned:

(August 2015 value of Equipment *as-is, where is*)

less

(July 2018 value of Equipment *as-is, where is*)

Black Iron argues that "the [b]ankruptcy [c]ourt failed to account for the costs Wells Fargo avoided in selling the Equipment *as-is, where-is*." [Appellants' Br. at 44 (italics added).]  Black Iron bases this argument on the estimate by Wells Fargo's expert witness (Patrick Mazzanti) of the costs required to remove the Equipment. [Id.]  Black Iron points out that Wells Fargo avoided these costs by leaving the Equipment where it was.

Mr. Mazzanti testified that the August 2015 value of the railcars was $20,000 per hopper ($10,800,000 for 540 railcars) and the value of the locomotives was $175,000 each ($700,000 for four).  [Appellants' App. vol. 13 at 195–96.]  Thus,

21

Mr. Mazzanti assessed the total value of the Equipment in August 2015 at $11,500,000.  The bankruptcy court relied on this calculation for the value of the Equipment in August 2015.  [Appellants' App. vol. 1 at 67.]

Mr. Mazzanti's calculation improperly inflated the 2015 value of the Equipment.  When calculating the 2015 value, Mr. Mazzanti included not just the value of the Equipment *as is, where is*, but also the cost of removing the Equipment.  Those removal costs included two categories of costs:

1.  The cost to repair the Equipment so that it could be moved. [Appellants' App. vol. 13 at 209 (indicating that his estimate included costs for repairs).]

2.  The cost to transport the Equipment after the repairs were made.  [Id. at 195 (indicating that the estimate included costs for transportation).]

Mr. Mazzanti's supporting documents show the bankruptcy court's error.  The documents said that the 2015 calculation was for Equipment that was "ready for service and sold in place with no repairs necessary to be placed in service." [Appellants' App. vol. 3 at 51 (hoppers); see id. at 52 (locomotives).]***  But everyone agrees that the Equipment was not in working condition in 2015.  So the court needed to reduce the 2015 value to account for the costs that Wells Fargo would have incurred in repairing and transporting the Equipment.  Omission of these

---

*** By assuming that the Equipment was "sold in place," Mr. Mazzanti indicated that his estimate included repair costs but not transportation costs.  But he testified that his estimate had included transportation costs.  [See Appellants' App. vol. 13 at 195.]  However we resolve this inconsistency in his account, the estimate of the 2015 value assumed that the Equipment was in working order.

costs led the bankruptcy court to improperly inflate the August 2015 value of the Equipment, which in turn served to improperly inflate the conversion award.

But we see no error in the bankruptcy court's calculation of the 2018 value of the Equipment. Rather than rely on an estimate for the July 2018 value of the Equipment, the bankruptcy court found that the July 2018 value of the Equipment was its actual sale price. [Appellants' App. vol. 1 at 67 (finding that the July 2018 value of the Equipment was the price for which the Equipment was sold); Appellants' App. vol. 15 at 93, 95 (receipts for sale of the Equipment).] Because the July 2018 valuation was based on the actual sale price rather than Mr. Mazzanti's estimates, we see no clear error in the valuation as of 2018.

Because the bankruptcy court erred in inflating the 2015 value of the Equipment, we vacate the damages award and remand for the bankruptcy court to calculate Wells Fargo's loss as

<u>(August 2015 value of Equipment *as-is, where is*)</u>

less

<u>(July 2018 value of Equipment *as-is, where is*)</u>

On remand, the bankruptcy court has the discretion to determine whether it

- needs to hold a new trial or

- can resolve its error by relying on the evidence already in the record.

D.

Finally, Black Iron argues the bankruptcy court erred by finding the Transfer fraudulent under UFTA—specifically under Utah Code §§ 25-6-5(1)(a) and 25-6-6(2).[†††]  Utah Code § 25-6-5(1)(a) provides that a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor."

Black Iron acknowledges that courts generally review factual findings on fraudulent transfer for clear error but proposes we review the bankruptcy court's determination de novo because it involves "a mixed question of law and fact where the legal analysis predominates."  In re U.S. Med., Inc., 531 F.3d 1272, 1275 (10th Cir. 2008).  While the ultimate question of fraudulent transfer is mixed, the specific findings on intent are factual and subject to review under a clearly erroneous standard.  Leathers v. Leathers, 856 F.3d 729, 762 (10th Cir. 2017) ("Whether a debtor transferred his property with intent to defraud creditors is a finding of fact." (quoting In re Seay, 215 B.R. 780, 788 (B.A.P. 10th Cir. 1997))).  The burden of proof on intent is clear and convincing evidence.[‡‡‡]  Jones v. Mackey Price Thompson & Ostler, 469 P.3d 879, 890–91 (Utah 2020) ("Under the pre-2017 law

---

[†††] Recall these provisions reflect pre-2017 law.  See supra note 3.

[‡‡‡] Black Iron suggests that the bankruptcy court required only a preponderance of the evidence because it cited Selvage v. J.J. Johnson & Assocs., 910 P.2d 1252, 1262 (Utah Ct. App. 1996) in a footnote.  [Appellants' Br. at 61.]  We disagree that the court's reference to Selvage in a footnote shows it applied the wrong burden of proof.  At any rate, we know and measure the evidence against the correct burden of proof.

[applicable here], the plaintiff bore the burden of proving all claims asserting intent to hinder, delay, or defraud by clear and convincing evidence."). Thus, we review all the evidence and consider whether "we are left with the definite and firm conviction," In re Miniscribe, 309 F.3d at 1240 (quoting In re Peterson Distrib., Inc., 82 F.3d 956, 959 (10th Cir. 1996)), that the bankruptcy court made a mistake in finding, by clear and convincing evidence, that CML made the Transfer with actual intent to hinder, delay, or defraud Wells Fargo.

The bankruptcy court pointed to three key facts in finding intent: (1) CML started forbearance negotiations with Wells Fargo before the Transfer; (2) the parties never finalized the forbearance agreement; and (3) CML discussed that Wells Fargo would receive no proceeds from a sale. [Appellants' App. vol.1 at 42–44.] Black Iron argues the bankruptcy court applied too low a standard in evaluating CML's intent. It says that actual intent requires more than an effort to put off payment and that forbearance negotiations do not satisfy UFTA's requirements. According to Black Iron, a court's focus should be on the intent related to the Transfer—not on what happened before or after the Transfer.

But Black Iron's critiques take too narrow a view of the bankruptcy court's analysis and the relevant evidence. To start, "there is no requirement that the intent to hinder, delay, or defraud be the sole or even primary motive of the defendant." Jones, 469 P.3d at 889. And, in enumerating factors to determine whether "actual intent" exists, the Utah legislature expressly authorized consideration of facts both "before" and "after" the transfer at-issue. See Utah Code Ann. § 25-6-5(2) (2015).

Black Iron makes too much of the bankruptcy court's statement that "hindrance or delay simply require an intention to put off payment." [Appellants' App. vol. 1 at 42.] Black Iron urges that the intent to hinder or delay must result from some improper or unacceptable action and forbearance negotiations alone do not evidence the requisite intent. That may be true. But the other facts combined with the forbearance negotiations show the improper or unacceptable action that establish intent in this case.

Black Iron does not dispute that CML planned to "drag [its] heels" and "push [Wells Fargo] out" on the forbearance negotiations. [Id. at 32.] And phone calls between Conboy and Gilbert show that they discussed payment to other creditors with the money from the Transfer but excluded Wells Fargo's obligation from payment. [See Appellants' App. vol. 15 at 10.] As one CML board member said to Gilbert, "no one's going to get screwed there. Just [Wells Fargo] is going to lose the former helm." [Appellants' App. vol. 23 at 15.] This intent came to fruition when CML paid other creditors out of money from the Closing, but not Wells Fargo. The bankruptcy court pointed to all this evidence to reach its determination that CML made the Transfer with actual intent to hinder, delay, or defraud Wells Fargo. We see no error.

Because the bankruptcy court did not err in finding the Transfer fraudulent under § 25-6-5(1)(a), and that ground is sufficient to affirm, we do not reach the alternative finding that the Transfer was fraudulent under § 25-6-6(2).

IV.

In sum, we AFFIRM the bankruptcy court's summary judgment rulings on storage fees, trespass, and fraudulent transfer.  We also AFFIRM the bankruptcy court's grant of summary judgment for Wells Fargo on conversion, but VACATE its award of conversion damages and REMAND for a reconsideration limited to that issue.

Entered for the Court

Per Curiam